2020 IL App (1st) 170500

THIRD DIVISION
December 30, 2020

No. 1-17-0500

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 6406 (02) |
| | ) | |
| MARION ANDRE COMIER, | ) | Honorable |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Ellis concurred in the judgment and opinion.
Presiding Justice Howse specially concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Defendant, Marion Andre Comier, was charged with intentionally setting fire to an apartment building in Cicero, Illinois, which resulted in the deaths of seven people, for the purpose of assisting his codefendant, Lawrence Myers, who is not a party to this appeal, to collect insurance proceeds on the building. Following a jury trial, defendant was convicted of seven counts of first-degree murder and sentenced to a term of natural life imprisonment. Defendant appeals his conviction on the grounds that (1) the trial court erroneously conditioned the admission of expert testimony concerning defendant's mental state when he gave an inculpatory statement upon defendant's submission to an examination by a State expert and (2) the trial court erroneously

failed to strike the State's expert's testimony that the fire was intentionally set using an accelerant and open flame because that opinion resulted from a flawed methodology and lacked a proper scientific basis.

¶ 2     The record shows that defendant and Myers were charged with 122 counts of first-degree murder, three counts of aggravated arson, two counts of aggravated battery to firefighter Dennis Ahrens, two counts of residential arson, two counts of conspiracy to commit aggravated arson and residential arson, three counts of arson, and one count of conspiracy to commit arson. The charges stemmed from a February 14, 2014, fire in an apartment building in Cicero, Illinois, which killed seven victims who resided in an attic bedroom of a second-floor apartment in the building. The victims who died in the fire included Sallie Gist and Byron Reed; their two children, three-year-old Rashon Reed, and three-day-old Brian Reed; Sallie's siblings, 16-year-old twins, Elijah Gist and Elisha Gist; and Tierra Davidson, a friend of the family who had stayed the night. The cause of death of the newborn, Brian, was determined to be an inhalation injury due to the apartment fire, and the cause of death of the remaining six victims was determined to be carbon monoxide intoxication due to the inhalation of smoke and soot due to the apartment fire. The second-floor apartment was also occupied at the time of the fire, but the people in that area were able to escape. Myers, who owned the building, was tried separately and convicted of first-degree murder for soliciting someone to burn down his building so that he could collect the insurance proceeds.

¶ 3     Defendant was charged with actually setting the fire, and the evidence against him included inculpatory statements made by defendant and Myers that were captured by police through a consensual overhear recording performed by Myers's girlfriend, Bonita Robertson.

¶ 4     Prior to trial, the defense hired a psychiatrist, Dr. Bruce Frumkin, to examine defendant. The defense tendered Dr. Frumkin's report to the State in discovery, in which the doctor opined

that defendant suffered from a psychotic disorder not otherwise specified and a cognitive disorder not otherwise specified on axis I and schizotypal disorder on axis II. Dr. Frumkin later updated his report to comply with the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) criteria but his diagnosis did not change. The updated report stated that defendant suffered from unspecified neurocognitive disorder, unspecified psychotic disorder, and schizotypal personality disorder. Specifically with regards to defendant's inculpatory statements captured on the consensual overhear, Dr. Frumkin opined:

> "[Defendant] is an individual who has eccentric and bizarre thinking, has at times a detachment from reality (although not to the extent he would be diagnosed as having schizophrenia), and has great difficulty processing emotional events. Sometimes people with serious mental disorders are not accurate in what they say. This may be something the trier of fact might want to consider when evaluating the weight to give to [defendant's] statements to *** Robertson."

¶ 5    On December 3, 2015, the State filed a written motion requesting the court order defendant to submit to a behavioral clinical examination and conduct a hearing on defendant's fitness for trial. The State asserted that it had been tendered Dr. Frumkin's report, which contained observations of defendant relevant to his fitness to stand trial. Based on the report, the State contended that *bona fide* doubt existed as to defendant's fitness to stand trial.

¶ 6    The defense asked the court to deny the State's request, alleging that there was no *bona fide* doubt of defendant's fitness to stand trial. Defendant attached a letter authored by Dr. Frumkin and dated after the State's motion, opining that defendant understood and appreciated "how the court system works and *** [was] capable of working with [counsel] towards his defense."

¶ 7      At a hearing on the State's motion on December 11, 2015, the State asserted that it was not the State's "position that the defendant was unfit for trial" but that the report raised certain doubts about defendant "having a detachment with reality." Accordingly, the State maintained that the "best practice" would be to have defendant evaluated so that his fitness did "not become an issue down the road." Defense counsel disagreed, maintaining that the defense was not raising fitness as an issue and that counsel had no doubt about defendant's fitness to stand trial. The court denied the State's request, noting that it had not observed anything that would make it question defendant's fitness.

¶ 8      Regarding Dr. Frumkin's report, the court stated, "I don't anticipate [he] is going to testify in this case in any fashion, is that correct?" Defense counsel responded, "Well, I'm not so sure about that, Judge, we may call him." The court continued:

> "THE COURT: But what would Dr. Frumkin be able to testify to?
>
> DEFENSE COUNSEL: Well, Judge, this is a situation where the totality of the circumstances of the statement that [defendant] made to Bonita Robertson is going to be at play, and I imagine that [defendant] is going to testify, and I imagine that the trier of fact in evaluating how much weight to give to the statement that [defendant] made to Miss Robertson, that weight can—how much weight it should give is going to be based also, I believe, on the psychological makeup of [defendant].
>
> ***
>
> THE COURT: Well, it certainly raises an issue as to whether or not [the State is] entitled to have an expert comment on the same information that *** they believe that their expert will comment on. If that's my understanding of what

- 4 -

they've said. If [the defense] intend[s] to call Dr. Frumkin and say at the time that he gave this statement he was under some sort of specific mental incapacity, then I think [the State] ha[s] the right to have an expert say the opposite of that, if that's what the doctor would say."

¶ 9 Defense counsel reiterated that defendant had not "filed an insanity answer, because that is not our defense in this case." Counsel proposed "if the State would like to retain an expert who wants to review Dr. Frumkin's psychological report and, also, the data from his psychological testing, they can be our guest. *** They have that report, and if they wanted to make an inquiry as to Dr. Frumkin's raw data from the tests that he administered, the testing instruments that he administered on [defendant], obviously, we would be more than happy to provide those to their psychologist." Counsel stated, however, that allowing defendant to be examined by a State expert would be "something we would object to."

¶ 10 Thereafter, on January 13, 2016, the State filed a motion *in limine* to bar the testimony of Dr. Frumkin. The State asserted that Dr. Frumkin's testimony was improper commentary on defendant's credibility, was not relevant or necessary, and that its probative value was outweighed by its prejudicial effect.

¶ 11 On January 27, 2016, the court heard arguments on the State's motion *in limine*. The State asserted that Dr. Frumkin's proposed testimony would be "irrelevant and unnecessary" and that "Dr. Frumkin's opinion of whether this defendant believes his statements to be true or not are wholly irrelevant, something that the trier of fact would be able to evaluate for themselves." The State further pointed out that "one of the most important things to establish here is the statements the defendant made to Miss Robertson were not under police—were not while he was in police custody. They weren't statements made to police officers." The State further asserted that Illinois

courts had "consistently barred that testimony because *** it would adversely comment on the credibility of a witness."

¶ 12    The court then stated,

"I don't know that Dr. Frumkin says that that statement—I don't think he can offer an opinion on whether or not the statement that you intend to introduce was, in fact, fabricated or not. *** What I'm not sure if we're talking about here is an actual mental incapacity or mental disease or defect that Dr. Frumkin would like to say he suffers from. Yet they would like to not have this to be an insanity defense. I'm somewhat in a quandary, but that's my understanding of what [the defense] want[s]."

¶ 13    The State responded,

"Well, Judge, [Dr. Frumkin] also states, *** I'm quoting, 'Sometimes people with serious mental disorders are not accurate in what they say.' What they want to believe and argue basically is because of whatever mental disorders the defendant may or may not have been suffering at the time, whatever he said to Miss Robertson may not be true, and he may be making it up. So *** that would be improper. That invades the province of the jury or the trier of fact."

¶ 14    The court then asked defense counsel,

"THE COURT: Doesn't the State have the opportunity to have [defendant] examined by an expert to determine—

DEFENSE COUNSEL: No.

THE COURT: Why not?

DEFENSE COUNSEL: Because I'm not using the insanity defense.

THE COURT: Sure, you are. You're using the same defense.

DEFENSE COUNSEL: No, I'm not.

THE COURT: You just told me that the sole reason for me to allow this expert to testify is so that the jury could be aware that [defendant] might have been suffering from a mental illness, let's semantically take this apart, and if that's what you want to do, it would be clear to me that the State's expert should be allowed to talk to [defendant] to determine whether or not his diagnosis is the same or not because that's what you want that jury to decide, this statement. And what you've just said—and I think—I don't know the facts of all of the case, but the case gets down to this statement, and if this statement is the crux of the case and you want a doctor to say, you know, he could have been nuts when he said that, the State has an opportunity to say there's nothing wrong with this guy, if that's what their expert says.

DEFENSE COUNSEL: Right, and we've talked about this before. He's gone through the testing. If the State wants to retain an expert, he will provide the tests that our client—

THE COURT: You'll provide your client.

DEFENSE COUNSEL: No, we don't have to provide our client.

THE COURT: Yes, you will. If you want to put him on for the purpose of what I just said, then you'll have to provide him.

\*\*\*

DEFENSE COUNSEL: [W]e will not allow our client to be examined by the State's doctor, period, because he has a right under the Fifth Amendment not to speak to anyone else regarding this case.

THE COURT: Not if what you're raising—

DEFENSE COUNSEL: But I'm not raising an insanity defense.

THE COURT: You're calling it a mental illness. A rose by any other name is still a rose.

\*\*\*

THE COURT: You think that they don't have the right to have an expert determine whether or not [defendant] is suffering from that mental illness by examining [defendant]?

DEFENSE COUNSEL: By examining, no. They can hire all the experts they want, and the experts can review the records that were generated from the tests that were administered by Dr. Frumkin, and they can come to their own conclusions based on the police reports and their listening of the [consensual overhear] and their review, like I said, of the tests that were administered and come up with their own opinion. That happens all the time, but they don't have a right to speak to my client.

\*\*\*

STATE: [W]hether this is a[n] insanity defense or Dr. Frumkin's allowed to testify as he states in his report, [the State should] be allowed to retain an expert for that same purpose."

¶ 15    In closing, the court informed the parties of its "belief, and you can brief this if you want, because I'm not necessarily ruling, because you can tell where my inclination is, is that if, in fact, you wish to have an examining doctor testify that [defendant] suffers from a mental illness as the three unspecified there, that [the State] ha[s] a right to examine him, whether you call it an insanity defense or not." The court then indicated that by the next status date, it "hop[ed] [that the State

would] have an expert who will be able to touch base with the defense expert, hopefully been able to have reviewed at least the documents."

¶ 16 On February 4, 2016, the defense filed an "Objection to the State's Expert Examining [Defendant]," in which defendant asserted that he could not be forced to participate in an evaluation requested by the State or ordered by the court.

¶ 17 Thereafter, on February 16, 2016, the State informed the court that it had retained an expert who had "reviewed Dr. Frumkin's materials as well as the recordings of the conversations in question" and had advised the State "that he would be unable to render an opinion without a face-to-face examination of the defendant." The State read from Dr. Frumkin's report and stated that it appeared that the doctor would opine "that [defendant] was lying when he made the statements" to Robertson and that the State's "concern was that Dr. Frumkin was going to be allowed to testify as to whether he believed the defendant was being accurate in giving the statement." Defense counsel stated that Dr. Frumkin would not be opining on whether the statements made to Robertson were true or false but that the defense's "objective is to provide the finder of fact with the psychological characteristics of [defendant] such that when the statement is introduced by the State, the jury has enough data within which to determine what weight to give that type of statement." The court then stated:

> "To some extent I agree with the fact that then of what relevance is all of this, other than it shows the finder of fact, assuming a jury, what the mental status of [defendant] is during the course of the period of time which in he made this statement; what he would be doing on a regular basis; would he be making exaggerated statements, whatever it might be, because of what he is diagnosed as some sort of unspecified schizophrenia, unspecified something else. *** And so

my belief is that if I were to order [the State expert] to interview [defendant], I would not be ordering him to inquire about the facts of the case or the facts regarding the statement. I would be ordering, if I ordered, an examination by [the State expert] as to whether or not [defendant] suffered from the illnesses as diagnosed by Frumkin."

¶ 18    On March 2, 2016, the court and parties continued discussing issues related to Dr. Frumkin's proposed testimony. The court expressed concern that the testimony would confuse the jury, stating:

"And what [the defense is] doing is presenting to a jury evidence of an individual who has been suffering from these illnesses for whatever period of time Dr. Frumkin says they are, which leads a finder of fact to have in the back of their mind, well, geez, maybe even if he set this fire, was he crazy when he did so, and that's not a farfetched rationale. Whether you actually argue that or not, and I don't imagine that you would *** [b]ut you still have—you still have the mental disease or defect or mental illness, if you want to call it that, in front of that jury for relatively no reason other than it's just out here somewhere and it seems to me that they should have the right to have that interview done."

¶ 19    The parties and the court discussed that, even if the State was able to find an expert witness who could review and comment on Dr. Frumkin's report without actually examining defendant, the credibility of that expert could be challenged by the fact that he or she did not actually examine defendant. The court then asked, "But that's the point, isn't it? The point is that [the defense has] this incredible advantage of having your expert speak to your client, which is fine, that's all up to you, but [the State doesn't] get to rebut it by having a personal interview and diagnosis."

¶ 20    In ruling, the court clarified that it would allow Dr. Frumkin to testify to defendant's diagnoses and the characteristics of those diagnoses, but that he would not be able to "get[ ] into specifically the facts of the case or the statements that [defendant] made." Given the narrow framework of "what Dr. Frumkin [could] testify to," the court also ordered that the State's expert would be prevented from inquiring into the facts of the case and whether defendant committed the offense. The State's expert would similarly be able to only testify regarding "whether or not [defendant] suffers from those illnesses" and what were the "symptoms of the illnesses that he suffers from." The court then told defense counsel, "then, of course, if you don't want [defendant] examined, then I'm going to preclude you from putting on Dr. Frumkin."

¶ 21    Thereafter, on April 20, 2016, the State informed the court that its psychologist had reviewed documents received from Dr. Frumkin and confirmed that he would not be able to render an opinion without a personal interview of defendant. In light of the defense's position that it would not submit defendant to an interview with a State expert, the trial court ruled that Dr. Frumkin would not be allowed to testify. The court explained, "so that it's clear, without making [defendant] available for the State's expert, I'm going to exclude him from testifying ***. If [the defense] should change [its] position on that, [it] can certainly do so."

¶ 22    The matter continued to trial. Robertson testified that in late 2009 to February 2010, she was living with Myers, with whom she had a romantic relationship. Robertson testified that Myers's health was deteriorating, and she considered herself Myers's caregiver, helping keep track of his multiple medications. Robertson also considered herself Myers's business partner, helping him collect rents and manage financial aspects of the multiple rental properties Myers owned. Robertson testified that she was aware of Myers's financial situation. In early 2010, Myers was having financial difficulties; he had approximately $7000 in property taxes on the buildings he

owned coming due, as well as approximately $18,000 in taxes owed to the Internal Revenue Service (IRS).

¶ 23    Robertson testified that she knew defendant because he rented an apartment from Myers, and Myers later hired defendant to do maintenance work on his rental properties. In December 2009, Robertson overheard a conversation between defendant and Myers during which Myers asked defendant if defendant would "get the job done," to which defendant responded affirmatively. Later that day, Robertson asked Myers what job he was asking defendant to do, and Myers told Robertson that defendant had proposed burning down the building at issue so that Myers could collect insurance proceeds. Also that day, Robertson asked defendant about the conversation and whether they planned to burn down the building. Defendant responded, "yeah, we are, but that's none of your f*** business."

¶ 24    Robertson further testified that around that time, Robertson's cousin, Brian Trent, was living with her and Myers. In late December 2009 or early January 2010, Myers asked Robertson and Trent if they would burn a building down for him. Robertson told Myers "no" and that she did not want any "part of it."

¶ 25    Later, in February 2010, Robertson and Trent had a conversation with defendant. Robertson again asked defendant if he still planned to burn the building. Defendant responded that Myers had been constantly calling him about burning the building and why he had not done it yet, but defendant said he was not going to burn the building and was only telling Myers what Myers wanted to hear.

¶ 26    Robertson testified that a few days before the fire she was present for a conversation during which Myers screamed at defendant about why he had not set fire to the building yet. During another conversation around the same time, Myers commented on how much money he had offered

defendant to "do the job," and defendant stated that he had put some clothes on a couch that was sitting on the back porch of the building and poured gasoline and oil over them. Robertson testified that defendant said all that had to be done was to "strike a match and walk out."

¶ 27    The night before the fire, Robertson, Trent, and Myers went to a bar and stayed until approximately 1 a.m. They later went to a fast food restaurant, ate, and fell asleep in their apartment. Robertson testified that she woke around 6:30 a.m. when Myers's phone rang. Robertson heard Myers answer the phone and have a very brief conversation. Approximately five minutes later, a tenant called Myers. Myers then told Robertson and Trent to go to the building to see "if it was indeed on fire." Robertson asked Myers about the first phone call he received, and Myers told her the call was from defendant and that defendant had told Myers, "it's done, don't call." Robertson and Trent drove to the building and saw that it was engulfed in flames.

¶ 28    After seeing the building, Robertson returned home and spoke to Myers. Myers told Robertson that if she was questioned by police, she should "deny, deny, deny that [she knew] anything."

¶ 29    Approximately two days after the fire, Robertson asked defendant if he had set the fire, and defendant told her, "yes, I did." Robertson told defendant that Myers had been saying that he did not think defendant had done it, and defendant said, "aw, that's bulls***" and went on to tell Robertson "exactly how he set the fire in full detail."

¶ 30    Robertson testified that when she first began to hear about the plan to burn the building, she attempted to tell a police officer on one occasion that she "knew about something bad that was being planned," but the police never followed up with her. Robertson did not continue to attempt to alert police because defendant repeatedly assured Robertson he was not actually going to set the fire and that he was just telling Myers what Myers wanted to hear.

¶ 31　Two days after the fire, Robertson contacted police and eventually spoke with an assistant state's attorney. The police asked Robertson if she would be "willing to wear a wire," and she agreed. On February 18, 2010, Robertson signed the necessary paperwork for a consensual overhear. The consensual overhear captured several conversations between Robertson, Myers, and defendant, which were played for the jury at trial.

¶ 32　In a February 21, 2010, recorded conversation between Robertson and defendant, defendant admitted setting the fire and explained how he did it. In that conversation, Robertson told defendant that Myers "has some fears and so do I cause we know that the police are gonna be talking to everybody" and that they were "gonna come after all of us." Robertson then said to defendant:

> "ROBERTSON: Now, Larry [Myers] told me he offered you about 3,000.
>
> DEFENDANT: Bulls***, he's lying.
>
> ROBERTSON: Okay, what did he offer you?
>
> DEFENDANT: He offered me 15. He's lying.
>
> ROBERTSON: 15,000?
>
> DEFENDANT: Yeah."

¶ 33　Robertson then told defendant that Myers was "questioning whether or not you did it." Defendant laughed. The conversation continued:

> "ROBERTSON: I'm not kidding you.
>
> DEFENDANT: See, that's crazy.
>
> ROBERTSON: He wants to know if you really did it cause he's saying he thinks you're taking him for the money.
>
> DEFENDANT: Oh, he's full of s***. Don't start this, man.

\*\*\*

ROBERTSON: Did you do it?

DEFENDANT: It doesn't matter, Bonita, let's just leave it alone, man.

ROBERTSON: No, you have to let me know so I can tell him what—

DEFENDANT: He knows that already.

\*\*\*

ROBERTSON: So you did do it?

DEFENDANT: Well, I, I had mitts in it, so, yeah. If that's what you want to hear, yeah. So that's, I mean we shouldn't even be talking about this, man."

¶ 34    Robertson then asked defendant about how he started the fire. She asked:

"ROBERTSON: I need to ask you a question. \*\*\* [T]hey're saying that it started on the second floor. Now, if you started it on the couch, how the f\*\*\* did it start on the second floor?

DEFENDANT: Just went up. It went up. They don't know what they talking about.

\*\*\*

ROBERTSON: Cause they said that the—well, here's what they're saying. \*\*\* Detective Melone and the fire chief came and talked to me and Larry.

DEFENDANT: Yeah.

ROBERTSON: They said they didn't smell any accelerants like gas or any of that.

DEFENDANT: And I, and I know, and I know why, I know why they didn't.

ROBERTSON: Why?

\*\*\*

DEFENDANT: Cause I put oil with the gas. That's why.

\*\*\*

ROBERTSON: Whew, smart thinking, you know.

DEFENDANT: Of course, man, I thought this s\*\*\* out for a long time, man.

ROBERTSON: Smart thinking because \*\*\* he was scared \*\*\* cause they told us they took dogs in. \*\*\* And that the dogs \*\*\* were trained \*\*\* for smelling—

DEFENDANT: But that cuts down the—

ROBERTSON:—you know the gas—

DEFENDANT:—oil, the oil.

ROBERTSON: So the oil took the gas smell out?

DEFENDANT: Yeah.

ROBERTSON: So that the dogs couldn't pick it up?

DEFENDANT: There you go, and, and it burnt too bad for them to find anything.

ROBERTSON: But you started it on the back porch?

DEFENDANT: And it went up, Bonita. I don't want to talk about this. \*\*\* Everybody just say they don't know, okay, just leave it like that. That's what you do. Don't worry, okay. They didn't find nothing and that's great. They think the electrical box did it. \*\*\*

- 16 -

ROBERTSON: What the couch started it though?

DEFENDANT: Yeah, please, pretty much.

\*\*\*

ROBERTSON: All right, but you're sure—

DEFENDANT: I'm sure.

ROBERTSON:—you used oil with the gas?

DEFENDANT: And gas.

ROBERTSON: That's why the dogs didn't—

DEFENDANT: Get it.

ROBERTSON:—get that accelerant.

DEFENDANT: At the same time—and then the same time.

ROBERTSON: And you soaked it on the couch and the clothes.

DEFENDANT: I didn't have to soak it. Just—that's why I didn't soak it.

ROBERTSON: You just dumped it on the couch and the clothes—

DEFENDANT: Dumped it on there and threw the match.

ROBERTSON:—lit a match?

DEFENDANT: And that was it, yeah. And that's why it went up—

ROBERTSON: And you just walked out?

DEFENDANT: Yeah, pretty much."

¶ 35    At the end of the February 21, 2010, conversation, Robertson asked defendant about whether he called Myers the morning of the fire, telling him that the police were "gonna be checking [Myers'] records, phone records." She asked:

"ROBERTSON: I need to know did you call Larry that morning?

- 17 -

DEFENDANT: Yeah.

ROBERTSON: What did you say to him?

\*\*\*

DEFENDANT: I just said it's done and that was it.

ROBERTSON: You said it was done and that's it, okay. Before - what, what time did you call him[,] I need to know so I can—

DEFENDANT: Right after it. I shouldn't have called him like right after.

ROBERTSON: Right after.

DEFENDANT: Yeah. \*\*\* I knew I shouldn't have called him.

ROBERTSON: Well, you better come up with, with a reason why you called him cause they're checking phone records. I'm telling you."

¶ 36 The next day, February 22, 2010, Robertson asked Myers in a recorded conversation if he was giving defendant $15,000. Myers responded, "No, he's dreaming, you know. He's gonna get nothing for murdering them f\*\*\* people. I told him not to hurt anybody." Myers further told Robertson that he "never told [defendant] 15, I told him 3. That's what I told him was 3."

¶ 37 During a conversation recorded the following day, February 23, 2010, Robertson, Myers, and defendant discussed how much Myers had previously offered to pay defendant to burn the building. Myers asked defendant, "Where the f\*\*\* did you get I'm gonna give you 15,000?" and defendant answered, "That's what you told me." Myers denied telling defendant that, explaining how much he would receive from insurance, and how much he could afford to pay defendant from those proceeds. Specifically, Myers said that defendant would "get 5" if insurance gave "us more for the stoves and 'frigerators," and "[i]f nothing else, I'll give you 3. \*\*\* That's the best I can do with it." Defendant agreed.

¶ 38    Alan Strange testified that he is a senior forensic auditor with the Bureau of Alcohol, Tobacco, Firearms and Explosives and testified for the State as an expert in the field of forensic financial examinations. Strange testified that he performed a forensic analysis regarding Myers, reviewing various financial documents. Based on his review, Strange determined that Myers was experiencing several financial difficulties at the time of the fire in February 2010. Specifically, Myers had been failing to make his mortgage payments on three properties he owned, including an apartment building in La Crosse, Wisconsin, a single-family home in Bolingbrook, Illinois, and the Cicero apartment building at issue in this case. Regarding the La Crosse building, the bank that owned the mortgage sent Myers a collection notice in October 2009 and, thereafter, filed a foreclosure document with the circuit court in La Crosse County in January 2010. After Myers failed to make a January 2010 mortgage payment on the Bolingbrook property, the bank that owned that mortgage sent Myers a letter regarding the delinquency in early February 2010. Myers also failed to pay two months of mortgage payments on the Cicero apartment building, and on February 11, 2010, three days before the fire, the bank sent him a delinquency notice on that building as well. Finally, Myers also had approximately $8000 in property taxes coming due in March 2010. In total, Strange testified that February and March 2010, Myers owed approximately $16,000 but only had approximately $7000 available to him in his bank accounts.

¶ 39    Special Agent Joseph Raschke of the Federal Bureau of Investigations testified as an expert in the field of cell site tower analysis, regarding the 6:34 a.m. phone call from defendant to Myers on the morning of the fire. Agent Raschke testified that his investigation of the cell towers used to make the call indicated that the phone call was likely made from an area that included the location of the Cicero apartment building, and likely was not made from defendant's home.

¶ 40     Illinois State Fire Marshal arson investigator Mitchell Kushner testified as an expert for the State regarding his investigation into the fire. Kushner concluded that the fire was incendiary, meaning man-made, and that the fire was lit with the use of an ignitable liquid and an open flame. Kushner further testified that on the day after the fire he spoke with a Cicero police officer who had been on the scene of the blaze and observed V-pattern burns. From that conversation and observation, Kushner determined the fire started on the south portion of an enclosed area of the building's back porch. He conducted a search of that area with an accelerant detecting canine, but the canine did not indicate that it detected the presence of any accelerants. Kushner and other fire investigators continued to investigate the fire scene. Fire investigators searched for physical evidence that the cause of the fire was electrical but found none. Kushner spoke to firefighters who responded to the scene on the morning of the fire to ask if they detected the presence of natural gas and they had not. Kushner searched for physical evidence the cause of the fire was accidental, including by looking for evidence of smoking or smoking materials and how the fire burned; he also checked for lightning in the area at the time of the fire. Kushner found no evidence the cause of the fire was accidental.

¶ 41     Kushner further testified that on February 18, 2010, he spoke to a Cicero police detective who informed him that a female witness informed police that the fire had been started on the back porch using an accelerant and open flame. Kushner conducted a search of the back porch with his accelerant detecting canine. Kushner found the partial remains of couch springs and a couch strap but neither his canine nor subsequent testing of the items indicated the presence of an accelerant. Based on his investigation and witness statements, Kushner's opinion was that the fire was incendiary, the ignition source was a couch on the back porch, and the fire was started using a flammable liquid and an open flame.

¶ 42　On cross-examination, Kushner admitted that he based his opinion that the fire was incendiary and that it was started with an incendiary liquid with an open flame solely on the statement to police that gasoline was used to start the fire. The defense asked Kushner about the "negative corpus" approach in fire investigation. According to Kushner, the "negative corpus" method requires the fire investigator to consider all matters before jumping to conclusions and involves eliminating all other possible causes leaving only one possible cause as the cause of a fire. Kushner testified that at the time of trial, as opposed to the time of the fire, the use of the negative corpus approach was not the standard among fire investigators. Instead, the standard at the time of trial was to back up any findings with physical evidence, if possible, although statements by witnesses could be used to form an initial hypothesis as to the cause of a fire. Kushner agreed that no physical evidence existed that this fire was started with a liquid and an open flame. On redirect, Kushner testified he used the scientific method in his investigation. Kushner testified he used the witness statement in the process of gathering data, analyzing the data, and making a determination. Kushner testified that his opinion was based on his fire scene examination, witness information, training, and experience.

¶ 43　At the conclusion of Kushner's testimony, the defense moved to strike his testimony in its entirety on the ground that Kushner's methodology was not accepted in the relevant field. The trial court denied the motion to strike.

¶ 44　Defendant called Paul Bieber as an expert witness in the field of fire origin and cause determination. Bieber testified that the National Fire Prevention Association (NFPA) codes and standards contain the standards for fire investigation. Bieber testified that the 2011 version of the NFPA explicitly rejects the negative corpus approach, and that the proper relevant standard for fire

investigation is stated in NFPA 921.[1] Bieber agreed that NFPA 921 allows a fire investigator to rely on witness statements to develop a hypothesis as to how a fire started but testified that it does not allow a fire investigator to make a final conclusion as to how a fire started based only on a witness statement. Instead, the investigator's conclusion as to how a fire started must be based on physical evidence from the fire scene. Bieber opined that the determination by the State's fire investigators that the fire started on the rear porch and that the specific area of origin was somewhere near the couch complied with NFPA 921. However, the conclusion that the ignition source was an open flame, that an ignitable liquid was used, and that the fire was incendiary were not reached in compliance with NFPA 921 or industry standards because those opinions were based solely on a process of elimination of other possible causes—*i.e.*, the negative corpus

---

[1]NFPA 921 reads, in pertinent part, as follows:

"4.4.3.2 The actual investigation may include different steps and procedures, which will be determined by the purpose of the assignment. *** A fire *** investigation may include all or some of the following tasks: a scene inspection ***; witness interviews; *** and identification and collection of data from other appropriate sources."

"18.4.4.3 There are times when there is not physical evidence of the ignition source found at the origin, but where an ignition sequence can logically be inferred using other data. Any determination of fire cause should be based on evidence rather than on the absence of evidence; however, there are limited circumstances when the ignition source cannot be identified, but the ignition sequence can logically be inferred. This inference may be arrived at through the testing of alternate hypotheses involving potential ignition sequences, provided that the conclusion regarding the remaining ignition sequence is consistent with all known facts ***."

"18.5 The investigator should use the scientific method *** as the method for data gathering, hypothesis development, and hypothesis testing regarding the consideration of potential ignition sequences. *** Systematic evaluation (hypothesis testing) is then conducted with the elimination of those hypotheses that are not supportable (ore refuted) by the facts discovered through further examination. *** Potential ignition sources should be eliminated from consideration only if there is reliable evidence that they could not be the ignition source for the fire." Nat'l Fire Prot. Ass'n, NFPA 921 Guide for Fire & Explosion Investigations §§ 4.4.3.2, 18.4.4.3, 18.5 (2017).

approach—and not based on any physical evidence. Bieber opined that the cause of the fire in this case was "undetermined."

¶ 45    Myers testified for the defense. At the time of his testimony, Myers had been convicted of seven counts of first-degree murder arising from the fire at issue in this case. Myers testified that it was Robertson who suggested that Myers burn down the building for the purpose of killing a 16-year-old girl who lived in the building because she believed that Myers had sex with the girl. Myers testified that on the morning of the fire, after he, Robertson, and Trent ate hamburgers at the fast-food restaurant, Robertson entered Myers's garage and came out with a quart of turpentine. Myers then drove Robertson to the building where Robertson went to the back porch and poured the turpentine all over a broken futon. Myers testified Robertson lit the futon on fire with a cigarette lighter. Myers testified defendant called him on the morning of the fire to tell Myers defendant had finished some work he had been doing for Myers. Myers testified that conversations Robertson recorded in which Myers talked about money he was going to pay defendant were about commissions Myers was going to pay defendant for showing the building to prospective buyers. Myers did not recall conversations in which defendant said there was a pile of clothing on the porch and that all that needed to be done was to light a match or in which Myers told Robertson it was stupid for defendant to have done it in the morning because Myers did not want anyone to be hurt. Myers denied telling a Cicero police detective that Myers told defendant to burn the building while the children were at school and the women were at work, that he did not want anyone hurt, or that he just wanted the insurance money. Myers also denied telling his cellmate that defendant set the fire so that Myers could collect the insurance proceeds.

¶ 46    In rebuttal, the State called Sergeant Jason Stroud, of the Cicero Police Department, who testified that on March 3, 2010, Myers told him that defendant set the fire. Myers further told

Sergeant Stroud that defendant was supposed to set the fire at 11:30 a.m., when the adults were at work and children were at school, but defendant made a mistake and did it at 6:30 a.m., when everyone was in the building. Myers additionally stated that he had the fire set because he was in "tremendous financial straits" and needed the insurance money.

¶ 47    The State also called Myers's cellmate in rebuttal, who testified that in November 2010, Myers told him that he was "in for" arranging to have a building burned down to collect insurance money. Myers told his cellmate that he had planned the fire for months and identified defendant as being the person who actually set the fire. Myers also told the cellmate that he would have gotten away with it, "had it not been for [Robertson] cooperating with the police."

¶ 48    In closing argument the defense argued, in part, that there was no physical evidence of an ignitable fluid or an ignition source for the fire and Kushner's opinion was not in conformity with NFPA 921. The defense asked the jury to believe its expert's opinion that the cause of the fire was undetermined.

¶ 49    After deliberations, the jury found defendant guilty of seven counts of first-degree murder. The trial court sentenced defendant to natural life imprisonment.

¶ 50    In this appeal, defendant argues that the trial court denied him his constitutional right to present the circumstances surrounding the making of his inculpatory statements when it conditioned the admission of Dr. Frumkin's testimony on defendant's submission to an in-person examination by the State's expert. Defendant also argues that the trial court erroneously admitted Kushner's testimony the fire was incendiary and started with an ignitable liquid and open flame because he did not follow accepted fire investigation methodology in forming his opinion and it lacked a proper scientific basis. We will address each of defendant's issues in turn.

¶ 51 The due process clause of the fourteenth amendment (U.S. Const., amend. XIV) and the confrontation clauses of the federal and state constitutions (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8) guarantee criminal defendants "a meaningful opportunity to present a complete defense." (Internal quotation marks omitted.) *People v. Santos*, 211 Ill. 2d 395, 412 (2004). However, that right does not entitle a defendant to present his or her desired defense, unrebutted, in whatever fashion the defendant chooses. "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). A trial court may exclude evidence upon which a proposed defense is based if, in the exercise of its discretion, the court determines that the probative value of the evidence is outweighed by other factors, such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006); *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 104. When a defendant claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, we review the trial court's rulings for an abuse of discretion. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. A court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take its view. *McCullough*, 2015 IL App (2d) 121364, ¶ 104.

¶ 52 Initially, we note that the trial court neither ordered an examination of defendant, nor barred the testimony of Dr. Frumkin. Instead, the defense chose to not present the testimony of Dr. Frumkin after the court conditioned the introduction of that testimony on the State also having an opportunity to have defendant examined. The court also carefully circumscribed its ruling so that the State expert's examination would be limited to defendant's diagnoses and the symptoms of those diagnoses and specifically prohibited the State's expert from questioning defendant about

the pending charges or any facts surrounding the alleged offenses. It was only when the defense persisted in its position that it would not allow such an examination that the court ordered that Dr. Frumkin would not be allowed to testify. The court reiterated, however, that if the defense reconsidered its position, Dr. Frumkin would be allowed to testify. Accordingly, the question is not whether the court erred in ordering an examination or barring Dr. Frumkin's testimony but rather whether the court abused its discretion in conditioning the introduction of Dr. Frumkin's testimony on the State having an opportunity to have its own expert examine defendant.

¶ 53    Defendant argues that, under section 115-6 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-6 (West 2010)), the trial court did not have the right to order defendant to submit to a mental examination by the State and that doing so violated his fifth amendment privilege against self-incrimination. Section 115-6 of the Code provides:

> "If the defendant has given notice that he may rely upon the defense of insanity as defined in Section 6-2 of the Criminal Code of 1961 or the defendant indicates that he intends to plead guilty but mentally ill or the defense of intoxicated or drugged condition as defined in Section 6-3 of the Criminal Code of 1961 or if the facts and circumstances of the case justify a reasonable belief that the aforesaid defenses may be raised, the Court shall, on motion of the State, order the defendant to submit to examination by at least one clinical psychologist or psychiatrist, to be named by the prosecuting attorney." *Id.*

¶ 54    Defendant contends that because he was not raising an insanity defense, seeking to plead guilty but mentally ill, or pursuing an intoxication or drugged condition defense, the court was prohibited from ordering an examination. However, that section requires the court to order an

examination, not only when those defenses are actually raised but when "the facts and circumstances of the case justify a reasonable belief that the aforesaid defenses may be raised."

¶ 55    Here, defendant argued that he was not raising an insanity defense because he was not admitting guilt to the murder charges and that the State had no right to an opposing psychological examination. The court, however, disagreed with the defense's stated purpose and expressed its concern that introducing Dr. Frumkin's testimony would amount to the presentation of an insanity defense. The court explained that the introduction of that evidence could lead to confusion, causing the jury to question defendant's sanity at the time he set the fire, thus allowing the defense to effectively enter what amounted to an insanity defense without complying with the requirements of the insanity statute (see 720 ILCS 5/6-2(e) (West 2010) ("When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by clear and convincing evidence that the defendant is not guilty by reason of insanity.")) or the examination requirement of section 115-6. The circumstances presented here supported a reasonable belief by the trial judge that defendant was attempting to raise a mental status defense, like insanity or guilty but mentally ill, therefore warranting an order of an examination by a State expert.

¶ 56    Nonetheless, even if section 115-6 does not itself provide a basis for the court's decision, that section provides several circumstances in which a court is required to order defendant to submit to an examination, but it provides no reciprocal prohibition of such an order in other appropriate circumstances. As the trial court noted in its ruling, section 115-6 does not preclude the State from requesting that defendant submit to a psychiatric examination, or the trial court from ordering such an examination, when a defendant places his mental status at issue in a way not specifically delineated by that section. The judge noted, "[I]t's not really a prohibition. It's just not an inclusion." In the circumstances presented by this case, we find no abuse of discretion by the

trial court conditioning the defense's presentation of Dr. Frumkin's testimony upon the State having an opportunity to rebut that testimony with its own psychological examination of defendant.

¶ 57    A court presiding over a trial has the inherent authority or power to manage and control the proposed evidence the parties intend to present, and the court can limit that testimony when it would serve to confuse or confound the jury. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 58 ("[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by other factors, such as unfair prejudice, confusion of the issues, or potential to mislead the jury. [Citation.] A trial court has the inherent authority to admit or exclude evidence ***."). As the trial judge indicated on several occasions, hearing only Dr. Frumkin's opinion would improperly suggest to the jurors that the question of defendant's mental state and/or sanity around the time of the offense was before them. According to the trial court, Dr. Frumkin's proposed testimony could easily have been misinterpreted by a jury as an insanity defense. Although the trial court mentioned these concerns on several occasions, it was careful to point out that the defendant could call Dr. Frumkin so long as the State's expert also had the opportunity to examine the defendant regarding the issues to which Dr. Frumkin would testify.

¶ 58    Additionally, one of the most basic tenets of law is that a trial should be the search for truth. *People v. Daniels*, 75 Ill. App. 3d 35, 41 (1979) (" '[t]he basic purpose of a trial is the determination of truth' " (quoting *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416 (1966))). In furtherance of that purpose, the court may allow a party to present rebuttal evidence to explain, contradict, or disprove evidence presented by the other party. See *People v. Hood*, 213 Ill. 2d 244, 259 (2004) ("rebuttal testimony is intended to explain, contradict or disprove defendant's evidence"). Whether to admit rebuttal testimony is a matter within the sound discretion of the trial

court, and its decision will not be overturned unless it has abused its discretion. *People v. Woods*, 2011 IL App (1st) 091959, ¶ 26; *People v. Williams*, 96 Ill. App. 3d 958, 964 (1981) ("[T]he admissibility of rebuttal evidence is a matter left to the discretion of the trial court and is subject to review only in cases of clear abuse."). In the circumstances presented by this case, the evidence intended to be elicited by the State expert's examination of defendant—specifically, whether the State's expert agreed with Dr. Frumkin regarding defendant's diagnoses and the symptoms of those diagnoses—was a proper subject for rebuttal. See *Mitchell v. State*, 192 P.3d 721, 725 (Nev. 2008) ("even though [the defendant] did not raise an insanity defense," the trial court could order the defendant's examination as part of its "responsibility to promote the ascertainment of truth and to ensure the orderliness of the proceedings").

¶ 59    Based on the above, it cannot be said the court's ruling was fanciful, arbitrary, or capricious or that no rational trier of fact would agree with the court's decision. See *People v. Hall*, 195 Ill. 2d 1, 20 (2000). Rather, the record demonstrates that the trial court had legitimate and well-founded concerns about the introduction and use of Dr. Frumkin's report and proposed testimony in the manner desired by defense counsel, without the State having any opportunity to meaningfully respond to or test that evidence.

¶ 60    Defendant, however, contends that the trial court's ruling allowing the State an opportunity to rebut Dr. Frumkin's findings amounted to a forced "surrendering [of] his Fifth Amendment privilege." Similar arguments have been repeatedly rejected by courts throughout the country.

¶ 61    It has long been held that when a defendant raises an insanity, guilty but mentally ill, or other mental status defense, he may be constitutionally subjected to compulsory examination by a court-appointed or government psychiatrist. In *Buchanan v. Kentucky*, 483 U.S. 402, 404 (1987), the United States Supreme Court considered the question of "whether the admission of findings

- 29 -

from a psychiatric examination of petitioner proffered solely to rebut other psychological evidence presented by petitioner violated his Fifth and Sixth Amendment rights where his counsel had requested the examination and where petitioner attempted to establish at trial a mental-status defense." In those circumstances, the Supreme Court concluded that it did not, finding that because defendant presented psychological evidence to raise the "mental status" defense of extreme emotional disturbance, the prosecution "could not respond to this defense unless it presented other psychological evidence." *Id.* at 423. Accordingly, the Supreme Court held that the prosecution's introduction of a psychiatric report concerning the mental state of a homicide defendant, without describing any statements by defendant dealing with crimes for which he was charged, did not violate defendant's fifth amendment right. *Id.* at 423-24.

¶ 62    The United States Supreme Court revisited this issue in *Kansas v. Cheever*, 571 U.S. 87, 93 (2013), which reaffirmed *Buchanan* and explained the expanse of its holding. In *Cheever*, the Supreme Court concluded that where a defense expert examined a defendant and testified that he lacked the requisite mental state to commit a crime, the prosecution could offer evidence from a court-ordered psychological examination for the limited purpose of rebutting defendant's evidence without violating the fifth amendment. *Id.* at 98. The Court reaffirmed the "rule of *Buchanan*," specifically that "where a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal," reasoning that "[a]ny other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime." *Id.* at 94. "When a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence:

testimony from an expert who has also examined him." *Id.*; see also *Schneider v. Lynaugh*, 835 F.2d 570, 576-77 (5th Cir. 1988) (where defendant put his mental state at issue by calling social workers and counselors, their testimony was "analogous to the expert psychological evidence that the defendant introduced in *Buchanan*" and there was no fifth amendment violation because the "State's only effective means of countering Schneider's [mental status] defense was independent psychological testimony"; it would be "unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal: other psychological testimony").

¶ 63     This approach is shared by a number of state courts, which have also held that where a defendant demonstrates an intention to use expert testimony from a psychiatric examination to establish a mental status defense, a court may compel the defendant to submit to an examination by a government expert without violating the Fifth Amendment right against self-incrimination.

¶ 64     In *State v. Briand*, 547 A.2d 235, 239 (N.H. 1988), the Supreme Court of New Hampshire held that because a defendant was offering her own testimony indirectly when using an expert, she waived the right not to incriminate herself.

> "Because the expert's testimony is thus predicated on the defendant's statements, the latter are explicitly or implicitly placed in evidence through the testimony of the expert during his direct and cross-examination. Since a defendant would waive his privilege against compelled self-incrimination if he took the stand and made those same statements himself, his decision to introduce his account of relevant facts indirectly through an expert witness should likewise be treated as a waiver obligating him to provide the same access to the State's expert that he has given to his own, and opening the door to the introduction of resulting State's evidence, as

the State requests here, to the extent that he introduces comparable evidence on his own behalf." *Id.*

¶ 65     In *Mitchell*, 192 P.3d at 725, the Nevada Supreme Court considered a case involving a self-defense claim based on post-traumatic stress disorder and concluded that the district court had not abused its discretion by ordering a compelled examination of defendant after he indicated that he intended to use his own expert for a mental status defense. The court reasoned that a trial court "had the inherent authority to order the psychiatric examination, even though [the defendant] did not raise an insanity defense, because the district court had the responsibility to promote the ascertainment of truth and to ensure the orderliness of the proceedings." *Id.* Without the state's own psychiatric examination, the defendant would benefit from the "unfair asymmetry of introducing his own favorable expert testimony based upon personal interviews, while limiting the State's ability to rebut his contentions to cross-examining those defense experts and introducing generalized expert testimony." *Id.*; see also *Commonwealth v. Harris*, 11 N.E.3d 95, 111 (Mass. 2014) (the admission of expert testimony regarding a murder defendant's prior court-ordered competency evaluation to rebut his claim of a mental impairment precluding the intent to kill did not violate his right against self-incrimination); *State v. Goff*, 128 Ohio St. 3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 58 (when a defendant demonstrates an intent to use expert psychiatric testimony to establish, as element of self-defense, that battered-woman syndrome caused her to have a *bona fide* belief that she was in danger of death or great bodily harm and that her only means of escape was the use of force, the court could compel the defendant to submit to an examination by another expert without violating her right against self-incrimination); *People v. Herdman*, 2012 COA 89, ¶ 36 (the admission of prosecution's experts' testimony as to defendant's mental condition, based upon results of court-ordered examinations, did not violate the defendant's

privilege against self-incrimination, where defendant presented expert evidence concerning his mental condition as a defense to sexual assault and kidnapping); *State v. Hickson*, 630 So. 2d 172, 176-77 (Fla. 1993) (when a defendant's expert testified that the defendant suffered from battered-spouse syndrome to support a claim of self-defense, the State was entitled to its own independent examination so as to rebut the defense expert's testimony); *State v. Hess*, 828 P.2d 382, 386 (Mont. 1992) (where the defendant put her own mental state at issue and offered psychological evidence in her homicide defense, the trial court did not violate the defendant's right against self-incrimination when it required her to be examined by the State's expert for the limited purpose of rebutting the testimony of the defendant's expert); *Commonwealth v. Ostrander*, 805 N.E.2d 497 (Mass. 2004) (the trial court did not violate defendant's privilege against self-incrimination by compelling defendant to undergo a psychiatric examination and using the expert's opinion from that examination on the issue of the voluntariness of defendant's waiver of *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and his subsequent confession that he sexually abused his stepdaughters in order to permit the Commonwealth to rebut defendant's expert testimony on the subject, reasoning that permitting only one party to introduce expert testimony on crucial issue of voluntariness would have had a distorting effect on the fact finder's role and would have undermined society's conduct of a fair inquiry into defendant's culpability).

¶ 66    In light of this extensive and long-standing authority, we find no violation of defendant's fifth amendment rights by the trial court conditioning the defense's presentation of Dr. Frumkin's testimony upon the State being able to rebut defendant's mental status defense with their own psychological evidence.

¶ 67    In so holding, we are unpersuaded by defendant's reliance on *People v. Harlacher*, 262 Ill. App. 3d 1 (1994), and *People v. Lee*, 196 Ill. 2d 368 (2001), which are distinguishable for several reasons.

¶ 68    In *Harlacher*, 262 Ill. App. 3d at 2, the defendant was convicted after a jury trial of aggravated criminal sexual abuse and armed violence against his stepdaughter. The evidence consisted mainly of the testimony of the victim, defendant's statement to the police upon his arrest, and the defendant's own testimony. The defendant's pretrial motion to suppress, which was denied by the trial judge, was based upon testimony from the defendant's psychiatrist that, given defendant's emotional state at the time of his arrest, defendant was not capable of making voluntary statements to the detective who typed up a summary of defendant's version of the events. *Id.* at 4.

¶ 69    The court granted several motions *in limine* precluding any mention of the defendant's voluntary admission to a psychiatric hospital following his arrest and statement, and any reference to the fact that the victim's natural father and stepmother's positions as a prominent lawyer and judge, respectively, in the county where the offenses took place. *Id.* at 4-5. The trial court also ordered defendant be examined by a state psychiatrist, even though defendant's attorney indicated pretrial that he would not call his own mental health expert but did wish to present the defense of the involuntariness of his statements to police. *Id.* at 5.

¶ 70    On appeal, the defendant argued there were numerous errors in the trial court's exclusion of evidence that would have permitted the jury to draw an inference that his admissions made to the police were involuntary. The Appellate Court, Second District, reversed defendant's convictions, holding that the trial court erred in not permitting defendant to introduce evidence of the voluntariness of his confession, and that the error was not harmless. *Id.* at 8. The appellate court prefaced its decision on the fundamental principle of criminal procedure that a confession

must be voluntary and noted its consternation with the trial judge's failure to make any finding of the voluntariness of defendant's statements to police pretrial. The appellate court also concluded that the trial court "erroneously believed that if the defendant was to bring in *any* evidence of mental state, then he must be subjected to a section 115-6 hearing," despite the fact that no insanity or guilty but mentally ill defense was being raised. (Emphasis in original.) *Id.* at 7.

¶ 71    In reversing the convictions, the appellate court directed that the following evidence was to be admitted on retrial: (1) defendant's voluntary psychiatric admission to the hospital, (2) evidence that defendant felt pressure to make a statement due to the fact that the victim's father and stepmother were prominent members of the legal bar of the community, (3) evidence of the defendant's concern about his wife's alcohol consumption issues, and (4) testimony by expert psychology witnesses who would attest to defendant's susceptibility to suggestion at the time the confession was made. *Id.* at 8.

¶ 72    We note initially that we are not bound by the Second District's decision in *Harlacher*. Nonetheless, that decision is meaningfully distinguishable from the instant case and does not preclude a trial judge from setting reasonable conditions on the introduction of psychological evidence. In particular, the *Harlacher* court's decision was based principally upon the trial court denying defendant the opportunity to challenge the voluntariness of his statements. In this case, however, the voluntariness of defendant's statements was not at issue. Additionally, there is no indication that the trial judge in this case ordered an examination based upon an erroneous belief that any mention of the defendant's mental state required a section 115-6 examination. Instead, the court indicated that, in fairness to both sides, if the defense wished to challenge defendant's statements by way of psychiatric testimony, then, and only then, would the State have the opportunity to rebut that testimony with its own examination of defendant.

¶ 73    *Lee*, 196 Ill. 2d 368, is also distinguishable and must be considered in the context in which it was decided. The defendant in *Lee* was found guilty after a bench trial of aggravated vehicular hijacking and murdering a police officer. At a subsequent death penalty hearing, the defense called three experts who each testified that defendant suffered from varying mental disorders at the time of the shooting and that he had been previously hospitalized for mental health issues. *Id.* at 383. The defense also elicited testimony that defendant was adopted and that, just before the shooting rampage leading to the death of the police officer victim, defendant learned that his adoptive mother was about to remarry, which had a depressing effect on the defendant. *Id.* at 379. The jury was also advised that defendant had no prior criminal history. *Id.* at 383.

¶ 74    After what could be described as an eleventh-hour request, the court ordered the defendant to submit to an examination by a State psychiatrist, over the defense's objection. *Id.* at 376. Dr. Markos, an expert in the field of forensic psychiatry, testified in rebuttal, contradicting the defense experts' testimony. *Id.* at 379-80. Thereafter, following deliberations, a jury concluded that there were no mitigating factors sufficient to preclude the imposition of a death sentence, and the trial court sentenced the defendant to death. *Id.* at 372.

¶ 75    On appeal, the defendant in *Lee* did not make any claim regarding the sufficiency of the evidence, nor raise any trial errors at the guilt and innocence phase of his trial. He only contended that he had been denied a fair sentencing hearing because of numerous errors committed by the trial court.

¶ 76    The supreme court considered the applicability of section 115-6 at the death penalty phase of the proceedings and held that the trial court's order requiring a psychiatric exam by the State's expert was not permitted at the sentencing hearing, rejecting the State's argument that it should be allowed to rebut defendant's mitigation evidence. The court concluded that the trial judge's order

at the capital sentencing phase requiring defendant submit to a psychological examination by a state expert was not authorized by statute or the rules of procedure, and the subsequent introduction and use of the court-ordered expert testimony prejudiced defendant and entitled him to a new capital offense sentencing hearing. *Id.* at 382.

¶ 77    The *Lee* decision is distinguishable from the instant case, as it was based upon a precise and singular issue that is not applicable here. The supreme court in *Lee* was not reviewing any issues pertaining to the defendant's trial. It was considering only whether the trial judge's order was permitted at the most serious of all criminal proceedings at that time, the aggravation and mitigation hearing under the Illinois death penalty statute. As indicated above, the supreme court concluded that there was nothing in section 115-6 or in the discovery rules that permitted the court-ordered psychiatric examination of a defendant in a death penalty sentencing hearing. Accordingly, the holding in *Lee* has no applicability to the order entered here and does not control the outcome of this appeal. There is nothing in *Lee* to suggest that the trial court's ruling in this case was erroneous or that the supreme court would have precluded a court-ordered psychiatric examination under section 115-6 in a case such as the one here, where a defendant chooses to raise a mental status defense at his criminal trial.

¶ 78    Based on the above, we conclude that the court did not abuse its discretion in conditioning the defense's presentation of Dr. Frumkin's testimony upon the State being able to rebut defendant's mental status defense with their own psychological evidence.

¶ 79    Finally, defendant also challenges the bases of the State's expert's opinions in this case.

> "When determining the reliability of an expert witness, the trial judge is given broad discretion. [Citation.] Therefore, we review the trial court's decision to admit evidence, including expert witness testimony, for an abuse of that discretion.

[Citation.] Arbitrary, fanciful, or unreasonable decisions by the trial court constitute an abuse of discretion. [Citation.]" *People v. Lerma*, 2014 IL App (1st) 121880, ¶ 35.

¶ 80 Defendant contends that the trial court committed reversible error in admitting arson investigator Kushner's conclusion that the fire in this case was incendiary and caused by the use of an accelerant and open flame because that opinion "lacked a scientific basis" based on "the relevant scientific methodology" for fire investigations and did not comport with industry standards used in fire investigations.

¶ 81 Illinois Rule of Evidence 703 (eff. Jan. 1, 2011) addresses the bases of opinion testimony by experts and reads as follows: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

"[T]he admission of an expert's testimony requires the proponent to lay an adequate foundation establishing that the information upon which the expert bases his opinion is reliable. [Citations.] To lay an adequate foundation for expert testimony, it must be shown that the facts or data relied upon by the expert are of a type reasonably relied upon by [experts] in that particular field in forming opinions or inferences. [Citations.] It is the function of the trial court to determine whether the foundational requirements are met, which we review *de novo*. [Citation.]" (Internal quotation marks omitted.) *People v. Burhans*, 2016 IL App (3d) 140462, ¶ 30.

¶ 82    We find that the State provided sufficient evidence to show that the facts or data Kushner relied upon were of a type reasonably relied upon by experts in the field of fire investigation. "A scientific methodology need not be universally accepted or even accepted by a majority of experts in the field; '[i]nstead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field.' " *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 56 (quoting *In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004)). We acknowledge defendant's argument that his expert provided evidence that, at the time of trial, the methodology Kushner allegedly relied upon was no longer considered "industry standard." Nonetheless, Kushner testified he used the scientific method in his investigation. Kushner testified he used the witness's statement in the process of gathering data, analyzing that data, and making a determination. Kushner testified that his opinion was based on his fire scene examination, witness information, training, and experience. Kushner also testified that in making an investigation he uses the standards established by the NFPA, including use of the scientific method. See *supra* ¶ 44 n.1.

¶ 83    Regarding the conflicting evidence as to industry standards concerning "negative corpus" at the time of the fire and at the time of trial, defendant's expert admitted that the determination by the State's fire investigators that the fire started on the rear porch and that the specific area of origin was somewhere near the couch complied with NFPA 921 but testified that the conclusion that the ignition source was an open flame, that an ignitable liquid was used, and that the fire was incendiary (man-made) were not reached in compliance with industry standards because those opinions were based solely on the negative corpus approach, and it was not based on any physical evidence, in violation of NFPA 921 and the standards in the relevant scientific community. We note the trial court found Kushner did rely on "some physical evidence." Regardless, "[a]ny

weakness in the basis of an expert's opinion goes to the weight of the testimony; it should not affect its admissibility if the facts, data, or opinions are reasonably relied upon by experts in the relevant field." *People v. Lind*, 307 Ill. App. 3d 727, 739 (1999). Kushner's testimony concerning the nature and sources of his training, his methodology, industry standards, and the evidence upon which he relied in this case provided sufficient evidence that the underlying facts, data, and opinions were reasonably relied upon by experts in his field. "The opposing party has the responsibility to challenge on cross-examination the sufficiency or reliability of the expert's opinion" (*id.*), which defendant did in this case.

¶ 84    Accordingly, we conclude that there existed an adequate foundation for Kushner's expert opinion and the trial court did not abuse its discretion in admitting Kushner's testimony.

¶ 85    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 86    Affirmed.

¶ 87    PRESIDING JUSTICE HOWSE, specially concurring in part and dissenting in part:

¶ 88    I concur in that portion of the majority's judgment the trial court did not err in admitting Fire Marshall Kushner's testimony in this case. I dissent from the majority's judgment finding the trial court did not abuse its discretion by conditioning defendant's admission of expert testimony concerning his mental state when he made certain statements upon an involuntary examination by a State psychiatrist. The majority concludes that the "circumstances presented here supported a reasonable belief by the trial judge that defendant was attempting to raise a mental status defense, like insanity or guilty but mentally ill, therefore warranting an order of an examination by a State expert." *Supra*, ¶ 55. I disagree.

¶ 89    The majority reaches this conclusion after admitting that the trial judge simply "disagreed with the defense's *stated purpose*." (Emphasis added.) *Id.* Defendant was absolutely not raising

an insanity, guilty but mentally ill, or any other mental status *defense* to the offenses charged. Dr. Frumkin's report states the "purpose of the evaluation in part *** was to assess [defendant's] psychological functioning as it pertains to issues that are potentially relevant to his statements he made regarding the offense." His initial report concludes that defendant's test results are consistent with a diagnosis of Psychotic Disorder Not Otherwise Specified, Cognitive Disorder Not Otherwise Specified, and Schizotypal Personality Disorder. When Dr. Frumkin updated his report four years later in a letter to defendant's attorney, he again met with defendant and reviewed the recordings on the COH. Dr. Frumkin stated defendant's diagnoses remained unchanged but he updated them to DSM-V criteria. Dr. Frumkin's letter does describe statements defendant made about why he told Robertson defendant set the fire. However, Dr. Frumkin's letter goes on to state as follows:

> "I am in no way attempting to indicate that [defendant's] statements to Ms. Robertson were true or false. Even *if* [defendant] is innocent of the crime, I do not know whether his explanation as to why he told Ms. Robertson he did it was true versus some other explanation. [Defendant] is an individual who has eccentric and bizarre thinking, has at times a detachment from reality (although not to the extent he would be diagnosed as having schizophrenia), and has great difficulty processing emotional events. Sometimes people with serious mental disorders are not accurate in what they say. *This may be something the trier of fact might want to consider when evaluating the weight to give to [defendant's] statements to Ms. Robertson*." (Emphases added.)

¶ 90 The limited purpose of Dr. Frumkin's testimony, clearly articulated to the trial court, was to testify on the subject of defendant's mental condition at the time defendant made the statements

the State sought to use against him and the relationship, if any between that mental state and the making of the statement. If Dr. Frumkin testified in a manner suggesting a mental-status defense, as the trial court feared he might, the trial court could have revisited the matter and *then* either (1) ordered defendant to submit to a psychiatric evaluation by the State or (2) instructed the jury to disregard the testimony that went beyond the limited purpose so stated by the defense. However, unless and until that happened, the trial court had no reasonable grounds to believe defendant was attempting to raise a mental-status defense, no basis on which to condition the testimony, and, therefore, abused its discretion.

¶ 91 Nor do any of the "several circumstances in which a court is required to order [a] defendant to submit to an examination" pursuant to section 115-6 exist in this case. The majority correctly notes that "section 5/115-6 does not preclude the State from requesting that [a] defendant submit to a psychiatric examination, or the trial court from ordering such an examination, when a defendant places his mental status at issue in a way not specifically delineated by that section." *Supra*, ¶ 56. This argument misses the mark, however, because the question is not whether the trial court is precluded from issuing such an order; the question is whether the trial court is authorized to enter such an order. This authority is not found in the trial court's "inherent authority or power to manage and control the proposed evidence the parties intend to present" in order to avoid confusing the trier of fact or causing it to misinterpret the evidence. See *supra*, ¶ 57. Nor is such authority granted, or needed, to ensure a "search for the truth." See *supra*, ¶ 58. In the absence of any legal authority for its order the trial court abused its discretion. *People v. Patel*, 2020 IL App (2d) 190532, ¶ 22 ("the reviewing court must require the exercise of discretion consistent with the law").

¶ 92    Instructive of that finding, contrary to the majority's belief, is our supreme court's decision in *People v. Lee*, 196 Ill. 2d 368 (2001). In *Lee*, the issue was "whether the trial court could require that [the] defendant submit to the examination by Dr. Markos." *Id.* at 380. There was no dispute that section 115-6 did "not authorize the psychiatric examination in question" because the defendant "informed the trial court and the State that he would not rely upon any of [the listed] defenses at trial." *Id.* at 380-81. The court also found that Illinois Supreme Court Rule 413 (eff. July 1, 1982) did not authorize a psychiatric examination of the defendant. *Id.* at 381. "Pursuant to Rule 413, a judicial officer may require that an accused submit to a reasonable physical or medical inspection of his body. [Citation.] However, a psychiatric examination is not 'a "medical inspection" of the type contemplated by the rule.' [Citation.]" *Id.* at 381.

¶ 93    The majority ignores the State's argument in that appeal that "it must be afforded an opportunity to rebut the mitigation evidence presented by [the] defendant" and that the only way it could effectively do so was "to have its expert perform the psychiatric examination in question." *Id.* Our supreme court had already decided that where "the supreme court rules governing discovery in criminal trials [citation] are not applicable at a death penalty hearing" the trial court's order "was not authorized either by statute or by rule. As such, the trial court's order was improper." *Id.* at 382. In light of the State's "opportunity to rebut" argument our supreme court remained unpersuaded. The court stated it was "cognizant of the problems confronting the State." *Id.* Nonetheless, the court held "the actions of the trial court and the actions of this court *must be guided by the supreme court rules as presently written*. At the time the trial court ordered [the] defendant to submit to the psychiatric examination, such action was not authorized." (Emphasis added.) *Id.* at 382. The court thus held the trial court's order requiring the defendant to submit to a psychiatric examination was improper. *Id.* at 382-83.

¶ 94    The majority's basis for distinguishing *Lee* fails.  The majority finds *Lee* inapplicable because "[i]t was considering only whether the trial judge's order was permitted at the \*\*\* aggravation and mitigation hearing under the Illinois death penalty statute."  *Supra*.  The majority mistakenly relies on *Lee* and authorities from foreign jurisdictions addressing this legal issue in the context of sentencing hearings.  Despite the majority's attempt to distinguish it, I find more instructive on this issue the court's decision in *Harlacher*, 262 Ill. App. 3d at 7.  The majority concludes *Harlacher* "does not *preclude* a trial judge from setting reasonable conditions on the introduction of psychological evidence."  (Emphasis added.)  *Supra*, ¶ 72.  However, I believe the right question is whether the trial court in this case was authorized to compel defendant to become a witness against himself.  *Harlacher* does not provide that authority.

¶ 95    In *Harlacher*, the court found that the trial court in that case "*erroneously* believed that if the defendant was to bring in *any* evidence of mental state, then he must be subjected to a section 115-6 hearing."  (Emphasis added and in original.)  In *Harlacher*, the Winnebago County State's Attorney charged the defendant with aggravated criminal sexual abuse and armed violence.  *Id.* at 2.  On appeal, the defendant argued the trial court erroneously excluded evidence that would have permitted the jury to draw the inference that the defendant's statement to police was involuntary.  *Id.*  One of the defendant's motions *in liminie* challenged the State's right to have him submit to a mental examination by the State pursuant to section 115-6 of the Code.  "In the first issue on appeal, [the] defendant assert[ed] that he was denied a fair trial when the trial court improperly barred the defendant from presenting evidence which was pertinent to showing his statement was not voluntarily made.  The *Harlacher* court held that the trial court "erroneously believed that if the defendant was to bring in any evidence of mental state, then he must be subjected to a section 115-6 hearing."  (Emphasis omitted.)  *Id.* at 7.  The *Harlacher* court held:

"This belief by the [trial] court, that if the defendant was going to go into any discussion of his mental state at the time of confession, the court was permitted to order the defendant to be examined by the State's psychiatrist pursuant to section 115-6, was error. Such an examination is only required in cases in which the insanity defense, a plea of guilty but mentally ill at the time of the offense, or the defense of intoxicated or drugged condition is at issue. [Citation.] In this case, [the] defendant did not seek to rely on any of those defenses, but rather, he wished to assert that his statement to the police was not voluntary. Thus, the trial court abused its discretion in not permitting the defendant to introduce evidence of the involuntariness of his confession." *Id.* at 7-8.

¶ 96 There is no consequential difference between *Harlacher* and this case as to the question of whether section 115-6 applies. It does not. In this case, the State has not identified, nor have I found, any statute or rule authorizing the trial court's order in this case. On the contrary, the authority the majority finds for the trial court's order, if any exists, is restrained by the fifth amendment to the United States Constitution. See *Estelle v. Smith*, 451 U.S. 454, 466 (1981) ("[The defendant's] future dangerousness was a critical issue at the sentencing hearing, and one on which the State had the burden of proof ***. To meet its burden, the State used [the defendant's] own statements ***." "[T]he Court of Appeals correctly concluded that the Fifth Amendment privilege was implicated."). The Court's decision is *Estelle* does not require a similar holding in this case because the *Estelle* court held the defendant's fifth amendment rights were violated by the admission of the psychiatrist's testimony at the penalty phase and the defendant "was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death" and he "was not

informed that, accordingly, he had a constitutional right not to answer the questions put to him." *Estelle*, 451 U.S. at 467. Regardless, *Estelle* and *Lynaugh*, 835 F.2d at 576-77, relied upon by the majority (*supra*, ¶ 62), are instructive as to how this court should look at the evidence at issue in this case and instruct that the nature of the evidence, *i.e.*, whether it goes to the defendant's guilt or innocence or the "central issue" in sentencing, is relevant to the fifth amendment inquiry.[2]

¶ 97    The majority claims similar arguments "have been repeatedly rejected by courts throughout the country." *Supra*, ¶ 60. A careful examination, however, reveals that those cases involved circumstances not present here and are, therefore, totally inapposite. In almost every case the majority relies on the defendant is seeking to use a mental status to exculpate themselves and in the remaining cases the courts have determined that the evidence went to a central issue in the case. In this case, the credibility of one witness is not the "central issue" of the trial.

¶ 98    Once again the cases relied upon by the majority, including *Lynaugh*, do not hold that evidence concerning the credibility of a witness is inadmissible when that evidence is expert psychiatric testimony concerning the declarant but the State has not had the opportunity to conduct an independent mental examination of the declarant. More importantly, none of the cases involve evidence concerning the credibility of a witness, as does the evidence in this case, that the trial court effectively excluded. See *supra*, ¶¶ 61-65, citing *Buchanan*, 483 U.S. at 423-24 (" 'where petitioner attempted to establish at trial a mental-status defense' "); *Cheever*, 571 U.S. at 93

---

[2]     I acknowledge that in *Lynaugh*, 835 F.2d at 571-72, the defendant did not elicit expert psychiatric testimony to establish his innocence of the offense charged but rather the evidence the State sought to refute with the results of an examination by a court-appointed State psychiatrist came in at the punishment phase in the form of testimony that the defendant was capable of rehabilitation. Nonetheless, in rejecting the defendant's claim the admission of the independent psychological testimony violated the fifth amendment (*id.* at 577), the *Lynaugh* court noted that the evidence went to "the central issue at the sentencing phase—[the defendant's] sincerity in wanting to reform." *Id.* at 576.

("where a defense expert examined a defendant and testified that he lacked the requisite mental state to commit a crime"); *Harris*, 468 Mass. at 448-49 (evidence of mental impairment "precluding the intent to kill"); *Goff*, 128 Ohio St. at 181 ("expert psychiatric testimony to establish *** element of self-defense"); *Herdman*, 310 P.3d at 178-79 (expert evidence concerning mental condition "as a defense"); and *Hickson*, 630 So. 2d at 176-77 (evidence "to support a claim of self-defense"); *Hess*, 252 Mont. at 211 ("offered psychological evidence in her homicide defense").

¶ 99      In *Hess*, the defendant relied on "the affirmative defense of 'use of justifiable force or self-defense under the battered woman syndrome' " and ultimately was convicted of mitigated deliberate homicide. *Hess*, 252 Mont. at 210. The *Hess* court held the defendant "put her mental state at issue when she relied upon the affirmative defense of justifiable use of force and offered psychological evidence *** to support that defense." *Hess*, 252 Mont. at 211. In *Briand*, 130 N.H. at 651 the defendant sought to introduce the testimony of a psychologist "to support a potential self-defense plea or to prove provocation as it relates to the lesser-included offense of manslaughter." Thus, this testimony would establish a defense to the crime charged which in that case was purposely causing death. *Id.* The majority fails to acknowledge that aspect of the New Hampshire court's decision in which the issue was solely "whether the trial court may order a criminal defendant to submit to evaluation by a psychiatrist of the State's choosing when she relies on psychiatric testimony *to support a defense* other than insanity." (Emphasis added.) *Id.* at 652. But see *Briand*, 130 N.H. at 656 (fifth amendment "does not prevent the State, in the context of this case, from examining the defendant in order to rebut evidence she presents on an issue she has introduced").

¶ 100     In *Ostrander*, 441 Mass. at 344, although the expert's testimony went to the voluntariness of the defendant's waiver of his *Miranda* rights (*Ostrander*, 441 Mass. at 352), the decision is not

persuasive in this case for two reasons. First, the decisions on which it is based held, according to the *Ostrander* court itself, that the "reasoning underlying [those cases was that] where a defendant places at issue his mental state *at a critical time*, the jury should have the benefit of countervailing expert views." (Emphasis added and internal quotation marks omitted.) *Id.* at 353. In the cases on which *Ostrander* is based, the defendant offered psychiatric testimony to support a defense of lack of criminal responsibility, mental impairment to negate the *mens rea* of the charged crime, and an inability to premeditate or form a specific intent to kill. See *id.* at 352-53 (and cases cited therein).

¶ 101   The defendant in this case is not seeking to admit the psychiatric testimony to negate an element of the offense. Rather, in this case defendant only seeks to offer testimony that affects the credibility of a witness's statements which in this case are coincidentally defendant's own statements. True, in *Ostrander* the court rejected a similar argument: that the cases and their "progeny apply only to situations where the working of a defendant's mind at the time of the offense is at issue, but are inapposite in situations involving the defendant's mental condition at the time of his confession." *Id.* at 353-54. However, the court rejected that argument because in that case "the challenged mental state [did] not concern a collateral issue, but rather a defense set forth by the defendant." *Id.* at 354.

¶ 102   As to the question of fairness to the State in that situation as impacting the defendant's argument in *Ostrander*, something with which the majority is also concerned in this case (see *supra*, ¶ 62), the *Ostrander* court found it would be fundamentally unfair to permit "a one-sided presentation of expert evidence" to the trier of fact, which "must find that the confession was voluntary beyond a reasonable doubt." (Emphasis added.) *Id.* Here, however, the trier of fact is not being asked to determine the admissibility of any evidence based on psychiatric testimony or

to decide any issues based on psychiatric evidence *beyond a reasonable doubt*. Defendant is simply offering evidence that goes to his own credibility as a witness.

¶ 103   *Ostrander* simply provides no support for holding that evidence concerning the credibility of a witness is *inadmissible* when that evidence is expert psychiatric testimony concerning the declarant but the State has not had the opportunity to conduct an independent mental examination of the declarant.

¶ 104   While the trial court lacked authority for its order, "[i]t is well established under Illinois law 'evidence of a witness' mental condition is admissible to the extent it bears upon the credibility of the witness' testimony.' [Citations.]" *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 79. Our supreme court's decision in *People v. Becker*, 239 Ill. 2d 215, 236 (2010), also relied upon by the majority, is both not controlling of the outcome in this case and actually supports the admission of Dr. Frumkin's actual proposed testimony. The case is not controlling because Dr. Frumkin had not, and there was no indication he would, "comment directly on the credibility of another witness," which would be "improper." *Becker*, 239 Ill. 2d at 236. The case *supports* admission of Dr. Frumkin's testimony because in that case our supreme court held the defendant was permitted to apprise the jury of the circumstances surrounding certain statements through non-expert witnesses but, unlike Becker, in this case the "circumstances" are not within "the ken of the average juror" (*id.* at 237) and thus *expert* testimony is appropriate. Any party may attack the credibility of any witness. *People v. Evans*, 2016 IL App (3d) 140120, ¶ 30 (citing Illinois Rule of Evidence 607 (eff. Jan. 1, 2011). A defendant is subject to impeachment just as any other witness. *People v. Clark*, 9 Ill. App. 3d 998, 1003 (1973). Moreover, even with a voluntary confession,

"a defendant may still present evidence to the jury that affects its credibility or weight, or that challenges its reliability or truth. [Citations.] The jury's credibility inquiry will often turn on largely the same evidence as the judge's voluntariness inquiry, but the two are nonetheless 'separate inquires'; and the latter, a factual matter, is 'exclusively for the jury to assess.' *Crane v. Kentucky*, 476 U.S. 683, 688 (1986)." *People v. James*, 2017 IL App (1st) 143391, ¶¶ 129-130.

¶ 105   To get around the fact defendant was *not* raising a defense to the offenses charged based on a mental status but rather only trying to "controvert the State's proof" that his statements on the COH are reliable, the majority first mischaracterizes the record by asserting, repeatedly, that this case involves a "mental status defense that defendant intended to raise" and leaning on the trial court's subjective view "that what the defense was attempting to do was to raise an insanity defense." I note that had not happened, and thus no authority existed for the trial court to order defendant to undergo a psychiatric examination by the State. Section 115-6 of the Code of Criminal Procedure (725 ILCS 5/115-6 (West 2014)) provides as follows:

> "If the defendant has given notice that he may rely upon the defense of insanity as defined in Section 6-2 of the Criminal Code of 2012 or the defendant indicates that he intends to plead guilty but mentally ill or the defense of intoxicated or drugged condition as defined in Section 6-3 of the Criminal Code of 2012 or if the facts and circumstances of the case justify a reasonable belief that the aforesaid defenses may be raised, the Court shall, on motion of the State, order the defendant to submit to examination by at least one clinical psychologist or psychiatrist, to be named by the prosecuting attorney." 725 ILCS 5/115-6 (West 2018).

¶ 106   The circumstances of this case lie outside this rule.   The defense expressly stated, repeatedly, that it was not and would not raise an insanity defense.   The majority has pointed to no facts to contradict those statements.   Moreover, the majority's reliance on the contents of Dr. Frumkin's report is misplaced.   While the "report" does opine that defendant suffers from three mental disorders the report also states "people with serious mental disorders are not accurate in what they say."   The defense sought to admit evidence of defendant's mental disorders for the limited purpose of demonstrating that defendant may be a person who is not accurate in what he says—testimony that is perfectly permissible (*Viramontes*, 2017 IL App (1st) 142085, ¶ 79) and something that no court (cited by the majority) has held triggers a reciprocal right in the State to an independent mental examination which is otherwise protected against by the fifth amendment to the United States constitution.   See *supra* (and cases cited therein); *Buchanan*, 483 U.S. at 421.

¶ 107   If one circumstance changed, *i.e.* if defendant even hinted[3] at an insanity defense to the crime—rather than to the reliability of his statements—then so would the other, *i.e.* the trial court would be authorized to order defendant to undergo an evaluation by the State.   In this case, if the defense does establish that defendant is a person who sometimes is "not accurate in what [he] say[s]" and that the jury should consider that "when evaluating the weight to give to [defendant's] statements to *** Robertson," (see *infra*) he will not have established a defense that exonerates him.   Rather, that evidence, if accepted and credited by the jury, would be weighed next to the

---

[3]     I mean this literally. Section 115-6 of the Code of Criminal Procedure (725 ILCS 5/115-6 (West 2014)) provides that if the facts and circumstances of the case justify a reasonable *belief* an insanity defense *may* be raised, the trial court shall, on motion, order the defendant to submit to examination. I simply do not believe the facts and circumstances justify that belief at this time, based on defense counsel's clear, consistent, and unequivocal statements to the contrary.   Nor I note, does the majority point to anything to suggest defense counsel was lying other than the trial court's own conclusory speculations.

facts, circumstances, and substance of defendant's statements on the COH and all of the State's other evidence when the jury determines defendant's guilt. If at any time defendant exceeded the bounds of the limited purpose for which the expert testimony is clearly admissible, then the trial court is free to take corrective actions.

¶ 108   Given the indisputable admissibility of the proffered evidence for the limited purpose of using that evidence to attack defendant's credibility as a witness against himself, then, pursuant to Illinois Supreme Court Rule 413(c) (eff. Jul. 1, 1982), the defense was correct when it argued below that it was only required to turn over defendant's psychiatrist's report to the State. Rule 413(c) reads as follows:

> "Subject to constitutional limitations, the trial court shall, on written motion, require that the State be informed of, and permitted to inspect and copy or photograph, any reports or results, or testimony relative thereto, of physical or mental examinations or of scientific tests, experiments or comparisons, or any other reports or statements of experts which defense counsel has in his possession or control, including a statement of the qualifications of such experts, except that those portions of reports containing statements made by the defendant may be withheld if defense counsel does not intend to use any of the material contained in the report at a hearing or trial." Ill. S. Ct. R. 413(c) (eff. Jul. 1, 1982).[4]

---

[4]      The *Buchanan* court held that "if a defendant *** presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence *from the reports of the examination* that the defendant requested." (Emphasis added.) *Buchanan*, 483 U.S. at 422-23. That holding provides additional support for my conclusion that that Rule 413 controls and defendant was only required to turn over defendant's psychiatrist's report to the State.

¶ 109    Rule 413(c) does not require a defendant to submit to a psychological exam.    The trial court's order to defendant to submit to an examination by the State's expert was not authorized by statute or rule and was, therefore, improper.  *Lee*, 196 Ill. 2d at 382, *Harlacher*, 262 Ill. App. 3d at 7-8.

¶ 110    The trial court thus erred when it required defendant to submit to an in-person mental evaluation by the State's expert which it lacked legal authority to make.    That error was not harmless.  Evidentiary errors are harmless where there is no reasonable probability the jury would have acquitted absent the error.  *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104.  See also *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 65, citing *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990). The remedy for an evidentiary error that is not harmless is reversal.  *Id.*  In this case, I cannot say the exclusion of evidence bearing on the credibility of defendant's statements was harmless beyond a reasonable doubt.  Absent the psychiatrist's testimony defendant was left with nothing to defend his statements other than testimony by Myers.  Myers' attempts at exculpating defendant were heavily impeached, making it appear that Myers' testimony was concocted, weakening the defense.  See, *e.g.*, *People v. Hudson*, 157 Ill. 2d 401, 444 (1993) ("challenging the credibility of a defendant and his theory of defense is proper in closing argument when there is evidence justifying the challenge"), *People v. Manley*, 222 Ill. App. 3d 896, 911 (1991) ("it was within the bounds of permissible argument for the prosecutor to challenge the veracity of the defendant's trial testimony").  The State did, in fact, argue in rebuttal as follows:

> "[W]hat did Larry Myers tell you yesterday?  What did he want you to believe to help out this guy?  [The trial court overruled defendant's objection to the State's argument.]  What did he tell you?  He told you a lot of things, but did any of them make any sense?  \*\*\*  He wanted you to believe that [Robertson] started

the fire.  Why?  Well, he is an old man with a broken heart who is still pining for her first of all.  And he can't believe she wore a wire."

¶ 111   There is a reasonable probability that, had defendant's expert testified, defendant would not have called Myers at all.  The jury would have been left with defendant's other statements, particularly to Robertson, which, especially absent the damage caused by Myers' testimony, the jury could have reasonably determined were not credible or reliable due to defendant's mental state.  Thus, had the psychiatrist's testimony been admitted there is a reasonable probability the jury would have acquitted defendant.  Accordingly, defendant's conviction should be reversed and, because the evidence is sufficient to sustain defendant's conviction for the offenses charged[5], the cause should be remanded for a new trial.

---

[5]      "[R]etrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence."  *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).

---

## No. 1-17-0500

---

| | |
|---|---|
| **Cite as:** | *People v. Comier*, 2020 IL App (1st) 170500 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-6406(02); the Hon. Geary W. Kull, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |

---