2022 IL App (1st) 201325-U
Order filed: April 21, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-20-1325

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 16469 |
| | ) | |
| PAUL MEYERS, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for dismembering a human body and concealing a homicidal death are affirmed, where the trial court did not abuse its discretion in admitting other-crimes evidence and defendant failed to preserve two other claims or show any reversable error.

¶ 2    Defendant-appellant, Paul Meyers, appeals from his convictions for dismembering a human body and concealing a homicidal death. On appeal, defendant contends that he was prejudiced by the trial court's admission of other-crimes evidence and the court's failure to properly instruct the jury with respect to that evidence, as well as by improper remarks made in the State's closing arguments. For the following reasons, we affirm.

¶ 3     We note at the outset that the evidence presented below was substantial. We restate here only the factual background necessary for our resolution of the limited issues raised on appeal.

¶ 4     Defendant was charged in an indictment generally alleging that, in June 2015, defendant murdered Laneesha Miller, dismembered her body, and concealed her death. Prior to defendant's 2020 jury trial, defendant filed a motion *in limine* asking the trial court to, *inter alia*, bar the State from introducing evidence that in 2012 he had shot his brother, Arronis (a/k/a Ronnie) Jackson. Defendant asserted that such evidence was irrelevant, constituted evidence of other crimes and was more prejudicial than probative.

¶ 5     Just prior to the beginning of defendant's jury trial, after defendant had withdrawn and then reinstated this specific motion *in limine*, the State agreed that it would not attempt to elicit any such testimony during its direct examination of witnesses and the parties agreed that the trial court would admonish certain witnesses not to discuss the shooting. Over defendant's objection, however, the State would be allowed to introduce evidence of two prior domestic disputes between defendant and the victim—who was defendant's girlfriend at the time—as to the issues of defendant's intent, motive, absence of mistake, to explain a continuing narrative and defendant's propensity to commit acts of domestic violence.[1]

¶ 6     During opening statements, defense counsel argued that the evidence would show that it was defendant's brother Jackson that killed the victim and dismembered her body in a "drug-fueled rage." Defense counsel further contended that defendant "loved [his brother] despite all his

---

[1] Illinois law specifically permits the admission of other-crimes evidence of domestic violence to show a defendant's propensity to commit domestic violence. 725 ILCS 5/115-7.4(a) (West 2020) ("In a criminal prosecution in which the defendant is accused of *** first degree murder or second degree murder when the commission of the offense involves domestic violence, evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant.").

problems," and that defendant thereafter decided to help Jackson by untruthfully taking responsibility for the murder and seeking to help Jackson because defendant "had already lost Laneesha, but he didn't want to lose Ronnie too, that would have just been too much." Defense counsel concluded by asserting that defendant "might be guilty of trying to help his brother, but he's certainly not guilty of first degree murder."[2]

¶ 7    At trial, the State presented evidence that the victim was living in Chicago during the summer of 2015 and was dating defendant. In early to mid-June, defendant and the victim were involved in two separate domestic disputes. In the first incident, the two were arguing outside defendant's house while the victim was sitting in her car and defendant was standing nearby. The window to the car was open slightly and defendant asked the victim to roll the window down and placed his hands inside the car. The window rolled up, and defendant broke the window as he snatched his hand back.

¶ 8    The second incident occurred on June 16, 2015. On that date, the victim called a friend— Myeka Fitzpatrick—in a highly agitated state. The victim then drove to Fitzpatrick's home and parked outside. Defendant drove up in his own car, yelled at the victim and put his hands on her. Defendant ultimately took the victim's phone and drove away. The victim drove off to follow him, and Fitzpatrick reported the incident to the police.

¶ 9    The victim's children and parents lived in Georgia, and the victim was to return to Georgia for her daughter's scheduled surgery on June 22, 2015. When she did not return as scheduled and could not be reached by phone, the victim's father filed a missing person report with the Chicago police department. The police learned that a home in Chicago in which both defendant and Jackson

---

[2] Jackson was convicted of concealing the homicidal death of the victim in a prior trial, and that conviction was affirmed on appeal. *People v. Jackson*, 2020 IL App (1st) 182368-U.

lived was a location the victim had been staying, and the police were ultimately able to speak with Jackson at that home on June 29, 2015.

¶ 10    On that day, Jackson allowed the police into the home, and the police observed that a bedroom where the victim had stayed with defendant was empty, appeared to have been recently cleaned and smelled of cleaning chemicals. This contrasted with the rest of the home, which was in a "pretty dirty" condition. The police discovered the victim's car on the same day, located approximately seven to eight miles from defendant's home. After obtaining a search warrant, the police discovered blood in the trunk of the car. The blood found in the trunk was analyzed and contained the victim's DNA. A search warrant was executed on defendant's home the following day, and florescent lighting indicated the presence of blood in several areas of the carpet, walls, and baseboard of defendant's bedroom.

¶ 11    On September 9, 2015, Jackson was taken into custody by the police. Jackson told the police that he knew he was being picked up because of a "missing girl" and that he knew where her body was located. Jackson took the police to a bridge on the Bishop Ford Expressway where it crossed over the Little Calumet River. The following day, the police returned to that location and discovered several pieces of luggage tied together with a cinder block along the river. Inside the luggage was a decomposed body that had been cut into approximately 14 pieces. The remains were analyzed, and they contained the victim's DNA. The State introduced expert testimony that the cause of the victim's death was homicide by unspecified means, with the body exhibiting evidence of post-mortem dismemberment by handsaw.

¶ 12    Richard El, Orlanders Thomas, and Floyd Beatty all testified that they were acquainted with defendant, and each also testified that defendant had admitted to killing the victim after he discovered that she was having sexual encounters with other men. In addition, El and Thomas

testified that defendant had shown them a body wrapped in a shower curtain in the trunk of the victim's car, while Thomas and Beatty testified that defendant admitted to dismembering the victim's body.

¶ 13    Jackson also testified at trial, after being admonished not to "testify or allude to in any way" that defendant had shot him. Jackson testified that defendant was his younger half-brother, and in June 2015 Jackson lived in a house in Chicago with defendant and several others. Jackson had previously been convicted of four felonies, including the conviction for concealing the homicidal death of the victim.

¶ 14    On June 21, 2015, Jackson was drunk, high on cocaine and had been awake for three days. There was a party at his home that included Jackson, defendant, the victim, and several others. At one point, Jackson was in his room with a woman named Tina Turner—whom defendant had driven to the party—while defendant was in his own room with the victim and several other people. Around 3:45 a.m. the following morning, Jackson heard a noise and went to defendant's room where he observed defendant and the others still "partying." Jackson then went back to his room to finish "getting high" and ultimately fell asleep.

¶ 15    When Jackson woke up, Turner was no longer there. Jackson then noticed that the door to defendant's bedroom was closed and a shower curtain was missing. Jackson later entered defendant's room and noticed that defendant's bedding was missing and neither defendant nor the victim were there. Jackson called defendant to obtain more drugs, but defendant did not answer. Jackson did not see his brother for several days.

¶ 16    A few days later, defendant entered Jackson's room at around 4:00 or 5:00 in the morning and asked Jackson to take a ride. Defendant drove the victim's car and Jackson drove his mother's car. Jackson followed defendant until defendant stopped on the Bishop Ford Expressway on a

bridge over the Little Calumet River. Jackson observed defendant throw bags of ice and five pieces of luggage over the bridge into the river. The luggage had been tied together with a cinder block.

¶ 17    The two returned to the cars and Jackson then followed defendant until defendant parked the victim's car on a street along the way home. Jackson drove defendant home without asking any questions, and defendant did not say anything about what had occurred. Defendant moved out of the home a few days later, and as a service to the owner of the building Jackson had defendant's room cleaned. Jackson did not notice any blood in the room.

¶ 18    Jackson was arrested on September 9, 2015, and he took the police to the bridge where defendant had thrown the luggage into the river. Jackson stated that he only learned that the victim's remains were inside the luggage when he was charged with concealing a homicide. Jackson acknowledged that he did not tell the police about what had happened when he spoke with the police earlier in the summer of 2015, testifying that he did not do so because he was afraid of defendant. Jackson no longer had that fear in September, because defendant was in police custody at that time. Jackson denied having anything to do with the victim's murder.

¶ 19    Following Jackson's direct testimony, the State argued that defendant's opening statements—the content of which the State was not previously aware—indicated that the defense theory was that Jackson had murdered the victim and defendant only agreed to help conceal the murder out of love and loyalty to his brother. The State contended that this opened the door for the State to reopen its direct examination of Jackson to ask about the prior shooting, especially considering Jackson's testimony that part of the reason he was not truthful with the police was because he was afraid of defendant.

¶ 20    Defendant responded by asserting that he had not opened the door to such evidence because opening statements are not evidence, and in any case such evidence was more prejudicial than

probative. The trial court agreed that the door to this evidence had not been opened by defendant because opening statements are not evidence, but further held that depending on if defendant testified and depending on the content of that testimony, "the Court is going to revisit this and I may allow that" evidence to be introduced by the State in rebuttal.

¶ 21    On cross-examination, Jackson testified that he was addicted to crack cocaine in 2015 and would do anything for drugs. He admitted to breaking into defendant's room to steal drugs on June 22, 2015. He also admitted that it was a chain for his dog that was used to bind the luggage together, but Jackson denied being the one to tie the luggage together.

¶ 22    Defendant testified on his own behalf and admitted that he had a prior felony conviction for unlawful use of a weapon by a felon.

¶ 23    In June 2015, he was in a romantic relationship with the victim. On June 21, 2015, he spent the day with the victim but left her at the house he shared with Jackson and some others to eat dinner at his mother's house. When he returned later that evening, defendant, Jackson, the victim, and a few others began entertaining themselves by drinking and smoking marijuana. At Jackson's request, defendant left and picked up Turner to bring her to the house. Defendant then gave Jackson some crack cocaine. At some point the party started to wane and defendant drove Turner home. Defendant then stopped at his mother's nearby home to make some food. Defendant fell asleep at his mother's home and did not return to his house until 5:00 or 6:00 in the morning.

¶ 24    When he returned home in the morning, Jackson met defendant at the door. Jackson appeared to be high, and something seemed wrong with him. The victim was not there. Defendant entered the house and smelled bleach. After talking to Jackson, defendant went out to the garage where the victim's car was parked. Defendant opened the trunk and found the victim's body inside. Defendant denied that he had killed the victim or placed her in the trunk.

¶ 25    Defendant returned to the house and confronted Jackson. He then went into his room and cried. At that point he noticed that the lock to his room was broken, his sheets were missing, and the room smelled of bleach. Defendant decided that he was not going to call the police because: "It was too much for me. I had just [lost] Laneesha, Laneesha was dead, and I didn't want to lose my brother also." Defendant then began drinking and using cocaine, and the two brothers decided to get rid of the victim's remains by finding a place for Jackson to "cut her up her body."

¶ 26    Defendant admitted to seeking out help from El, Thomas and Beatty to dispose of the victim's body, and admitted telling Thomas and Beatty that he had killed the victim because he thought they would call the police if they knew Jackson had done so. When defendant could not obtain any assistance, defendant returned the victim's car and keys to Jackson and left. Defendant denied killing the victim, dismembering her body, or throwing her remains into a river. He did, however, lie to the police to protect Jackson from prosecution.

¶ 27    On cross-examination, defendant testified that he loved his brother, they were close, defendant did not want to see Jackson go to jail and defendant would do whatever was necessary to protect him. When the State asked defendant if he would "take a bullet" for Jackson or die for him, defendant stated: "Yeah, I love my brother."

¶ 28    The defense then rested, and the State argued that it should be allowed to present evidence in rebuttal regarding the prior shooting because defendant's testimony regarding his close, loving relationship with Jackson opened the door. The State contended that the door to this evidence was opened by defendant's testimony on direct examination, as elaborated in his testimony on cross-examination. Defendant contended that such rebuttal testimony should not be allowed, as it was the State's questioning and not defense questioning of defendant that arguably opened the door. The trial court agreed with the State, ruling as follows:

"The Court is exercising its discretion to determine whether the probative value outweighs any unfair prejudice to the defendant. I do believe the defendant has opened the door by saying he's had this loving relationship with the defendant and that—with the co-defendant, his brother Arronis Jackson, and that he would do anything for him. The State's choice of words about taking a bullet, it was their phraseology, but he said he would die for him and that they were extremely close, is my recollection of what he testified to, and this rebuts that and I'll allow it."

¶ 29    In rebuttal, Jackson testified that in May 2012 he was living at his mother's house along with defendant. Jackson confronted defendant about a satellite radio Jackson believed defendant had taken from one of Jackson's friends. In response, defendant told Jackson "[y]our going to respect me" and then he shot Jackson in the right leg. Jackson was taken to a hospital by ambulance, but he did not file a police report because he did not want to upset his mother. Jackson generally testified that he did not have a close relationship with defendant as an adult and the two did not confide in each other. Their relationship also changed after 2012, as after the shooting Jackson did not trust defendant. In surrebuttal, defendant denied shooting Jackson and testified that he loved his brother.

¶ 30    Following closing arguments and being provided instructions, the jury found defendant not guilty of first degree murder but guilty of dismembering a human body and concealing a homicidal death. Defendant's motion for a new trial—which included an argument that Jackson's testimony about the prior shooting was improperly allowed into evidence—was denied. Defendant was thereafter sentenced to consecutive terms of 30 years' imprisonment for dismembering a human body and 5 years' imprisonment for concealing a homicidal death. Defendant's motion to reconsider his sentence was denied, and he now appeals.

¶ 31     On appeal, defendant first contends that the trial court abused its discretion by allowing the State to introduce other-crimes evidence in the form of Jackson's testimony that defendant previously shot him. We disagree.

¶ 32     "All relevant evidence is admissible, except as otherwise provided by law. Evidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). " 'Relevant evidence' " means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, evidence of other crimes, wrongs, or acts is generally not admissible to prove the character of a person for the purpose of proving action in conformity therewith on a particular occasion. Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). This is because "[s]uch evidence overpersuades the jury, which might convict the defendant only because it feels he is a bad person deserving punishment." *People v. Richardson*, 123 Ill. 2d 322, 339 (1988).

¶ 33     Nevertheless, such evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Although relevant, such "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 34     We review a trial court's admission of evidence for an abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). A trial court abuses its discretion when its decision is " 'arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 39 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 133 (2007)). When applying this deferential standard, we must uphold the trial court's

decision even if "reasonable minds [can] differ" about whether such evidence is admissible. *Illgen*, 145 Ill. 2d at 375–76.

¶ 35　We first address defendant's contention that there was no "probative reason" for the State to introduce evidence of the prior shooting because the State did not seek to introduce that evidence "for Meyers' identification, presence, intent, motive, design, or knowledge." The rules of evidence certainly do allow other-crimes evidence to be introduced for these and other specifically identified reasons. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, we disagree with defendant that the State did not introduce evidence of the prior shooting for any of these reasons, as this evidence went directly to the issue of defendant's motive.

¶ 36　"Motive" has been defined as "the inducement to do some act." *People v. Boyd*, 366 Ill. App. 3d 84, 92 (2006); see also Black's Law Dictionary (11th ed. 2019) (defining motive as "[s]omething, esp. willful desire, that leads one to act."). Here, defendant testified that Jackson killed the victim and that it was only defendant's close relationship with Jackson and defendant's desire not to "lose" his brother that motivated him to help protect Jackson from prosecution by hiding the victim's body. The express reason the State sought to introduce Jackson's rebuttal testimony was to rebut this testimony regarding defendant's purported motive.

¶ 37　Moreover, the list of reasons to admit other crimes evidence contained in Rule of Evidence 404(b) is not exhaustive and other-crimes evidence is admissible "if it is relevant for any purpose other than to show the propensity to commit crime." *Illgen*, 145 Ill. 2d at 364-65; *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991) (other-crimes evidence is admissible if relevant to any material question besides propensity). It is well-recognized that a court "may allow a party to present rebuttal evidence to explain, contradict, or disprove evidence presented by the other party." *People v. Comier*, 2020 IL App (1st) 170500, ¶ 58. Again, that is the express reason the State

sought to introduce Jackson's rebuttal testimony, where it would contradict defendant's testimony regarding the brothers' close and loving relationship. This was also the express reason the trial court found that testimony to be relevant. We also reiterate that evidence is relevant if it has *any* tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). The trial court thus did not abuse its discretion in finding this rebuttal evidence of defendant's motive relevant.

¶ 38    We next address defendant's contention that the "other crimes evidence was more prejudicial than probative because *** the credibility of Meyers was paramount in the jury's determination of whether Meyers['] or Jackson's version of events were to be believed, and erroneously the jury was able to consider the prior alleged shooting to consider Meyers' credibility." As an initial matter, this argument misstates the applicable test, where relevant evidence will only be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 39    This argument also appears to presuppose that the other-crimes evidence was so unduly prejudicial that it should not have been admitted. However, we reiterate that the "admissibility of other-crimes evidence rests within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of discretion." *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). Here, defendant has failed to establish that the trial court's balancing of the prejudicial and probative value of the other-crimes evidence was arbitrary, fanciful or unreasonable, or that no reasonable person would take the same view. *Jackson*, 2014 IL App (1st) 123258, ¶ 39. As such, defendant has not shown that the trial court abused its discretion in admitting that evidence.

¶ 40    In so ruling, we necessarily reject several more specific arguments raised by defendant on appeal. First, we reject defendant's contention that the trial court abused its discretion by admitting Jackson's testimony regarding the "alleged, uncharged shooting," where the State failed to prove beyond a "mere suspicion" that the shooting actually occurred." See *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 52 (quoting *Thingvold*, 145 Ill. 2d at 456) ("[T]he State does not need to prove defendant's involvement in other crimes beyond a reasonable doubt but instead such proof must be 'more than a mere suspicion.' "). To the extent defendant complains that the State only presented unreliable evidence of an "alleged, uncharged shooting" that was never reported to the police, we note that other-crimes evidence does not pertain solely to prior convictions but also encompasses prior bad acts. *Illgen*, 145 Ill.2d at 365. Furthermore, it is axiomatic that a positive and credible identification from only a single eyewitness is sufficient to sustain a conviction beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 27. Jackson's testimony about the shooting was arguably sufficient to satisfy the higher reasonable doubt standard without any further corroborating evidence, and as such we find that it clearly satisfied the lower mere suspicion standard.

¶ 41    We also reject defendant's contention that any probative value of the other-crimes evidence was outweighed by prejudice where the "excessive" amount of testimony regarding the prior shooting improperly allowed a "mini-trial to take place." It is certainly true that admitting other-crimes evidence should not lead to a " 'mini-trial' of the collateral offense." *People v. Walston*, 386 Ill. App. 3d 598, 619 (2010) (quoting *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995)). Accordingly, a trial court should limit the details of the other crimes to only what is necessary to illuminate the issue for which the evidence was introduced. *Walston*, 386 Ill. App. 3d at 619. Here, Jackson's entire rebuttal testimony comprised only nine pages of the lengthy transcript of

defendant's trial, and only a portion of that testimony contained the basic circumstances surrounding the shooting. The portion of Jackson's rebuttal testimony regarding the shooting was therefore properly limited to only what was necessary and did not result in an improper mini-trial.

¶ 42 Third, we reject defendant's contention that evidence of the shooting was improperly admitted where it was *the State* that first introduced evidence of defendant's close relationship with Jackson during its cross-examination of defendant. He supports this argument by citation to *People v. Harris*, 224 Ill. App. 3d 649, 652-53 (1992), where the court held that "when the theory of self-defense is raised the relevancy of the defendant's prior convictions for crimes of violence outweighs the prejudicial effect of such convictions only when the defendant clearly puts his character in issue by introducing evidence of his good character to show that he is a peaceful person" and that "the State cannot circumvent this rule by eliciting testimony from the defendant concerning his good character on cross-examination and then using that as a basis upon which to offer rebuttal evidence."

¶ 43 As an initial matter, *Harris* is simply inapplicable where the issue here is not the admissibility of evidence of defendant's bad character to defeat a claim of self-defense. Even if there was some general rule to be gleaned from *Harris* regarding the inability of the State to introduce rebuttal evidence solely to counter evidence that the State itself first introduced on cross-examination, that too is not the situation presented here. Contrary to his assertions on appeal, it was defendant that first introduced evidence of his purportedly close and loving relationship with Jackson, causing the State to seek to introduce rebuttal evidence. Specifically, on direct examination defendant testified that he did not kill the victim and only acted to help Jackson out of a desire to protect him from the police and so as not to "lose" him in addition to the victim. We recognize that defendant expounded on those themes in his answers to the State's questions on

cross-examination, and the trial court relied in part on defendant's answers to questions on cross-examination in allowing Jackson's rebuttal testimony. Nevertheless, this case does not present a situation where it was the State that first elicited testimony during cross-examination for the sole purpose of providing a basis to later present contrary evidence in rebuttal.

¶ 44 For similar reasons, we also reject defendant's contention that the State acted in bad faith by first agreeing not to elicit any testimony about the prior shooting and then eliciting evidence on cross-examination that would allow such evidence to be admitted in rebuttal. The record is clear that the State initially sought to elicit such evidence only after it heard defense counsel's opening statement and was made aware of defendant's theory of the case, asserting that as a result circumstances had changed. Furthermore, the State never sought to introduce such evidence without first obtaining a ruling from the trial court allowing it to do so, which the State only obtained after defendant himself opened the door to that evidence. There is simply no evidence in the record that the State engaged in bad faith in this respect.

¶ 45 Having concluded that the trial court did not abuse its discretion in admitting the other-crimes evidence, we now turn to defendant's argument that he was nevertheless prejudiced because the trial court failed to properly instruct the jury with respect to that evidence. We find this argument to be both forfeited and unfounded.

¶ 46 Defendant notes that the jury was presented with three instances of prior "uncharged offenses," which included two acts of domestic violence against the victim and the shooting of Jackson. Defendant also notes that the jury was provided the following relevant instructions:

> "Evidence has been received that the defendant has been involved in another offense other than those charged in the indictment.
>
> This evidence has been received on the issues of the defendant's intent, motive,

absence of mistake, to explain a continuing narrative and propensity to commit acts of domestic violence and may be considered by you only for that limited purpose.

¶ 47     It is for you to determine whether the defendant was involved in that offense, and if so, what weight should be given to this evidence on the issues of intent, motive, common scheme or design and propensity to commit acts of domestic violence."

¶ 48     On appeal, defendant asserts that it is "apparent from the record" that these instructions were intended to instruct the jury with respect to "the prior incidents of alleged domestic violence between Meyers and Miller, and [were] not intended to instruct the jury at all regarding the shooting." He further contends that because the jury was "not given any instruction that specifically related to the shooting offense," and because the State did not introduce evidence of the shooting for any of the reasons listed in the instructions actually provided, those instructions "only served to likely confuse the jurors as to which offenses it could consider for which purposes."

¶ 49     However, defendant never raised this issue at trial and did not include it in his posttrial motion for a new trial. Our supreme court has consistently recognized that "a defendant will be deemed to have procedurally defaulted his right to obtain review of any supposed jury instruction error if he failed to object to the instruction or offer an alternative at trial and did not raise the issue in a posttrial motion." *People v. Sargent*, 239 Ill. 2d 166, 188–89 (2010) (citing *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007)). Furthermore, defendant has not sought application of the plain-error doctrine to this issue on appeal, not even after the State's response brief highlighted his failure to properly preserve this issue below. As, such defendant has forfeited such review of this issue on appeal. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010) ("when a defendant fails to present an argument on how *** the plain-error doctrine is satisfied, he forfeits plain-error review"); Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not

be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 50    Forfeiture aside, we find unpersuasive defendant's assertion of reversible error in the instructions provided to the jury. "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). In determining whether the jury instructions accurately stated the law, we consider the jury instructions as a whole. *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 41.

¶ 51    It is true that the record indicates that the above-referenced instructions may have been primarily intended to instruct the jury as to the purposes for which it could consider defendant's prior acts of domestic violence against the victim, which included its use as evidence of defendant's propensity to do so. Nevertheless, these instructions also provided the jury with the correct legal principles applicable to the State's evidence about the prior shooting of Jackson where—as explained above—that evidence was introduced on the issue of defendant's motive. While these instructions may have indicated to the jury that it may also use the prior shooting as evidence of defendant's propensity to commit domestic violence, any possible error in that regard cannot amount to reversible error where any such error would only have prejudiced defendant—if at all—with respect to the first degree murder charge for which he was found not guilty. *People v. Eure*, 140 Ill. App. 3d 387, 399 (1986) (defendant not prejudiced by any possible error in jury instructions where "no judgment of conviction was entered").

¶ 52    Furthermore, to the extent that the evidence of the shooting was also specifically introduced to rebut defendant's testimony regarding his relationship with Jackson, the jury was also generally instructed as follows:

"Only you are the judges of the believability of the witnesses and the weight to be

given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case. You should [judge] the testimony of the defendant in the same manner as you judge the testimony of any other witness."

Considering them as a whole, we find that the jury instructions given in this case provided the jury with the correct legal principles applicable to the evidence of the prior shooting, and that any possible error did not prejudice defendant.

¶ 53    Finally, we consider defendant's argument that he was prejudiced when the State used the other-crimes evidence of the prior shooting in its closing rebuttal argument to improperly argue that defendant should be convicted in this case because he acted in conformity with his prior bad act. Once again, we find this argument to be forfeited.

¶ 54    First, defendant did not object to this argument at trial and did not include this issue in his posttrial motion. "To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion." *Wheeler*, 226 Ill. 2d at 122. Nor has defendant sought application of the plain-error doctrine with respect to this issue on appeal, thus forfeiting it for appellate review. *Supra* ¶ 49. Forfeiture aside, we find defendant's contention that he was prejudiced by the State's rebuttal argument to be unfounded.

¶ 55    A prosecutor is allowed wide latitude during closing arguments, and may comment on the evidence presented at trial, as well as any fair, reasonable inferences therefrom. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005); *People v. Cook*, 2018 IL App (1st) 142134, ¶ 61. On review, we

consider the challenged remarks in the context of the record as a whole, focusing in particular on the closing arguments of both sides. *People v. Williams*, 313 Ill. App. 3d 849, 863 (2000). Reversal is warranted only if the prosecutor's improper remarks substantially prejudiced defendant, that is, if the remarks constituted a material factor in his conviction. *Wheeler*, 226 Ill. 2d at 123.

¶ 56   Our supreme court has held that the question of whether statements by a prosecutor are so egregious that they warrant a new trial should be reviewed *de novo*. *Wheeler*, 226 Ill. 2d at 121 (applying *de novo* review). However, in *People v. Blue*, 189 Ill. 2d 99, 128 (2000), our supreme court also stated that abuse of discretion is the appropriate standard of review, stating "regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion" (internal quotation marks omitted).

¶ 57   This court has explained that no conflict exists between *Wheeler* and *Blue*, as "a reviewing court applies an abuse of discretion analysis to determinations about the propriety of a prosecutor's remarks during argument," but "reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial." *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64; *People v. Davis*, 2018 IL App (1st) 152413, ¶ 68; but see *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 48 (finding that "the abuse of discretion standard is the correct one"). In this case, defendant's claim of error fails under either standard.

¶ 58   The following portion of the State's rebuttal contains the purportedly improper remarks:

"Arronis told you that he did not feel comfortable talking to the police and telling them the truth because he was scared of his brother, and he didn't tell them the truth until the defendant was in custody, because at that point, he knew he was safe because his brother was away from him. And he has every right to be afraid of his brother because he was shot

by his brother before over a satellite radio. Can you imagine the defendant gets so angry with his own brother who he'd take a bullet for that he delivers a bullet to his brother in his leg with a 9-millimeter gun over a satellite radio. That's the kind of guy he is. You can just imagine how angry he'd be if he found out his girlfriend was two-timing him. Imagine what he'd do to her. Oh, right, we know.

Arronis is terrified of his brother. He helped him, I don't know that he wanted to, but he did. It wasn't the right thing to do, but he did it. He did it because his brother told him to do it."

¶ 59    Most of this argument was unquestionably proper. The State argued that the prior shooting was a primary reason Jackson was afraid of defendant, and this fear explained why Jackson did not tell the truth to the police until after defendant was in custody. However, in the context of making that argument, the State also asserted: "You can just imagine how angry he'd be if he found out his girlfriend was two-timing him. Imagine what he'd do to her. Oh, right, we know." If this argument did not amount to using defendant's prior bad act—shooting his brother when angered over a relatively minor dispute—as evidence of defendant's propensity for violence and to prove his action in conformity therewith, it came quite close.

¶ 60    However, even if we concluded that these remarks were improper, they did not constitute a material factor in defendant's convictions. Where a prosecutorial comment "exceeds the bounds of proper argument," we will not disturb the verdict "unless it can be said that the remark caused substantial prejudice to the defendant," considering "the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." (Internal quotation marks omitted.) *People v. Williams*, 192 Ill. 2d 548, 573 (2000).

¶ 61    The remarks at issue here are comprised of just three sentences out of over 52 pages of

closing arguments. The remarks about defendant's history of a quick temper and immediate resort to violence against Jackson were also most potentially prejudicial with respect to the charge of first degree murder, a charge for which defendant was found not guilty. Finally, defendant conceded at trial that he should be found guilty of concealing a homicidal death, and the evidence at trial included testimony from two individuals that defendant admitted to dismembering the victim's body. "It has been observed that 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " *People v. Simpson*, 2015 IL 116512, ¶ 36 (quoting *People v. R.C.,* 108 Ill. 2d 349, 356 (1985)). On this record, we cannot say that the brief prosecutorial remarks defendant challenges on appeal constituted a material factor in defendant's convictions, and therefore reversal is not warranted. See *Wheeler*, 226 Ill. 2d at 123.

¶ 62    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 63    Affirmed.